Delores Alston SMITH, etc.,
Plaintiff-Appellee,

v.

ITHACA CORPORATION and Texas City
Tankers Corporation,
Defendants-Appellants.

No. 77–1601.

United States Court of Appeals,
Fifth Circuit.

Feb. 22, 1980.

Joseph D. Cheavens, Houston, Tex., for defendants-appellants.

Alan Epstein, Philadelphia, Pa., for plaintiff-appellee.

Before WISDOM, HILL, and VANCE, Circuit Judges.

WISDOM, Circuit Judge:

Delores Alston Smith initiated this admiralty suit under the Death on the High Seas Act, 46 U.S.C. §§ 761–768 [DOHSA], the Jones Act, 46 U.S.C. § 688, and general maritime law to recover for the wrongful death of her husband, merchant seaman Rufus Eddie Smith.[1] Rufus Smith suffered a fatal heart attack caused by a coronary occlusion on January 25, 1972, two days after being discharged from the crew of the SS V.A. FOGG, a tanker that plied United States coastal waters carrying benzene and other petroleum products. In her suit against the owners and operators of the FOGG, Ithaca Corporation and Texas City Tankers Corporation, Delores Smith alleged that benzene fumes aboard the ship aggravated her husband's heart disorder and precipitated his death.

The district court, sitting without a jury, found that Smith's exposure to benzene fumes aboard the FOGG "directly result[ed] in his eventual demise."[2] The court concluded "that the conditions aboard the ship which contributed in part to the illness and death of Rufus Smith were unsafe as a result of the defendant's negligence in failing to protect against the emission of Benzine [sic] fumes"; and that "defendant's failure to protect against the Benzine [sic] fumes rendered the vessel unseaworthy." The opinion does not state whether liability was based on the Jones Act, DOHSA, general maritime law, or some combination of the three theories of recovery.

The defendants challenge the district court's factual determination that benzene fumes aboard the vessel contributed to Smith's death and that failure to protect against their emission constituted negligence and rendered the vessel unseaworthy. Counsel for the defendants also questioned during oral argument whether the district court properly awarded the plaintiff damages for loss of society.[3] We affirm. We hold that the district court's findings of liability based on negligence and unseaworthiness were not clearly erroneous. We

---

1. The plaintiff sued individually, as the administratrix of the estate of her husband, and on behalf of her minor children, Nathaniel Austin Smith, Michael Leon Smith, and Rufus E. Smith, Jr.

2. The district court awarded Mrs. Smith $100,000 damages for loss of society and loss of support, and $5,000 for repairs and maintenance the decedent would have performed on the Smith's home had he reached his life expectancy. The district court awarded Rufus E. Smith, Jr., $1,000 for loss of society and awarded Michael Leon Smith $25,000 for loss of society. In addition, the district court awarded $1,380 to compensate the plaintiff for funeral and burial expenses.

3. Damages for loss of society compensate surviving family members for the deprivation of certain nonpecuniary benefits the decedent would have provided had he lived. "The term 'society' embraces a broad range of mutual benefits each family member receives from the others' continued existence, including love, affection, care, attention, companionship, comfort, and protection." *Sea-Land Services, Inc. v. Gaudet,* 1974, 414 U.S. 573, 585, 94 S.Ct. 806, 815, 39 L.Ed.2d 9, 21. Loss of society does not encompass mental anguish and grief which are not compensable under federal maritime wrongful death remedies. *Id.* at n. 17, 94 S.Ct. 806.

further find that the plaintiff is entitled to damages for loss of society under the general maritime doctrine of unseaworthiness.[4]

## I.

Rufus Smith was a member of the crew of the FOGG from August 16, 1971 until January 23, 1972. He was a bedroom utility man. His duties aboard ship included cleaning living quarters and passageways, making beds, and laundering. Throughout Smith's employment, the FOGG transported petroleum products between ports on the Atlantic seaboard and the Gulf of Mexico. Typically, the FOGG transported benzene and other cargo from Puerto Rico to ports in Louisiana and Texas. At Texas ports, the FOGG loaded gasoline and methanol destined for New Jersey ports. The FOGG would leave New Jersey without cargo, return to Puerto Rico, and commence a similar 30-day voyage. When Smith joined the crew in Jacksonville, Florida, the FOGG was bound for Puerto Rico with empty cargo tanks.

In the district court, the plaintiff presented evidence showing that toxic benzene fumes permeated the living quarters of the FOGG, aggravated Smith's pre-existing heart disorder and arteriosclerosis, and caused his fatal heart attack. The defendants challenge the sufficiency of the plaintiff's evidence. Specifically, the defendants attack the district court's findings on the duration of the decedent's exposure to benzene and the cause of Smith's death; they attack the court's conclusions that the defendants were negligent and the ship unseaworthy. On appeal, we are limited to considering whether the district judge's findings are clearly erroneous. *McAllister v. United States,* 1954, 348 U.S. 19, 20, 75 S.Ct. 67, 99 L.Ed. 20, 24; *Market Insurance Co. v. United States,* 5 Cir. 1969, 415 F.2d 459, 461.

The evidence shows that the FOGG carried a cargo of benzene during 41 days of Smith's 161 days as a crewmember. The 41 days during which benzene was transported aboard the FOGG comprised separate eight to ten day periods. During a period equivalent to about nine of these 41 days, the crew was loading and discharging benzene or cleaning the storage tanks in preparation for loading another petroleum product. Contamination of the crew's quarters on the ship by escaping benzene fumes was most likely to have occurred during the loading, discharging, and cleaning operations.

The defendants maintain, based on the ship's log and testimony of the ship's captain and other crewmembers, that benzene fumes escaped from the storage tanks only during the 8 days, 15 hours, and 27 minutes required for loading, discharging, and cleaning the cargo tanks. They say that as much care as possible was taken during these operations to avoid contamination of the crew's quarters by escaping toxic gases. If the decedent was in fact exposed to benzene, the defendants argue, that exposure necessarily was limited to the time during which the storage tanks were opened for cleaning, loading, and unloading. The defendants construe the medical testimony offered by the plaintiff as establishing that nine days of exposure to benzene could not have aggravated Smith's pre-existing heart disorder. Accordingly, the defendants assert that benzene poisoning was not a contributing cause of Smith's death.

The plaintiff presented evidence that despite the few days during which the ship's storage tanks were open, benzene fumes contaminated the ship's living quarters for long periods. The fumes lingered on the ship, according to the plaintiff, because of the ship's poor ventilation system and because benzene vapor is heavier than air.[5] The plaintiff's evidence on this issue included portions of a Coast Guard Marine Board

---

4. *See Sea-Land Services, Inc. v. Gaudet,* 1974, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9; *Moragne v. States Marine Lines, Inc.,* 1970, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339; discussion in Part III, *infra.*

5. Benzene vapor at sea level is 2.80 times heavier than an equal volume of air.

of Investigation Report [6] and the testimony of members of the FOGG's crew.

Johnny Young, a crewmember on the FOGG during Smith's employment, testified, by way of deposition, that benzene fumes were constantly present in the crew's sleeping quarters and in the passageways in the living areas on the ship. Although he detected the odor of benzene daily, the fumes were more concentrated when the crew cleaned benzene from cargo tanks. According to Young, the fumes entered the crew's quarters through the air conditioning ducts and lingered indefinitely. Efforts to purify the air were unsuccessful, said Young; the ship's closed ventilation system recirculated the stagnant air.

Young's testimony is supported by the deposition of Donald W. Motes, the Chief Engineer aboard the FOGG. Motes testified that benzene fumes entered the crew's quarters through the ventilation system when the crew cleaned benzene from the storage tanks. Motes confirmed that the ship's ventilation system often only recirculated air instead of introducing fresh outside air. In addition, crewmember Jerry Mapes testified that he smelled benzene fumes in the crew's quarters on several occasions during the course of Smith's employment.

The defendants argue vigorously that the plaintiff's evidence fails to support the finding that benzene fumes were present aboard the ship for at least 41 days during Smith's employment, the minimal period necessary to produce toxic effects—as the defendants interpret the medical testimony. Young's testimony is not credible, the defendants say, because it is flatly contradicted by the ship's log which shows that loading, discharging, and cleaning of the benzene tanks totaled only nine days during Smith's employment. The evidence shows

that contamination of the living quarters by noxious fumes was most likely during the days of tank cleaning and loading. The evidence, however, is that because of the properties of benzene and the FOGG's inadequate ventilation system, benzene fumes lingered aboard the ship for long periods. Young's testimony supports this; his credibility was a question for the trial judge to resolve. The Coast Guard report also states that benzene fumes contaminated the working and living quarters of the vessel at times. On this record we cannot say that the district court was clearly erroneous in finding that Smith was exposed to benzene fumes for at least 41 days while aboard the FOGG.

The defendants also challenged the trial court's finding that benzene exposure caused Smith's death. The plaintiff established through the testimony of medical experts that sufficient concentrations of benzene vapors are deleterious to one's health; the fumes are a toxic poison affecting heart disorder and arteriosclerosis. The human body develops no tolerance to the gas; damage can be cumulative and permanent if the body is exposed to the gas for long periods. Significantly, the acceptable limit of exposure to benzene under normal working conditions is ten parts of benzene per one million parts air. The normal human olfactory system is unable to detect the aroma of benzene in concentrations of less than 100 parts per million.[7] The decedent, therefore, could have been exposed to concentrations of benzene that were ten times the safe limit before he or other crewmembers could detect the presence of the gas in the ship's quarters.

Smith died at the age of 42, two days after his discharge from the FOGG. The plaintiff's expert medical witness, Dr. Cyril H. Wecht, a forensic pathologist, testified

6. We address the defendants' objection to the admissibility of the Coast Guard Marine Board of Investigation Report in Part II of this opinion.

7. The plaintiff's medical witness, Dr. Comstock, stated that the minimum acceptable level of benzene exposure of ten parts per one million parts of air is based on normal industri-

al working conditions of eight hour days, five days per week. Since shipboard working conditions might entail constant exposure to the gas, Dr. Comstock further stated that "the margin of safety for safe levels on shipboard should be considered lower than the norm of safety normally considered in industrial practice".

that Smith suffered from "marked coronary artery disease". The immediate cause of death was complete occlusion of one of the major coronary arteries. Dr. Wecht further stated that "given [Smith's] underlying cardiovascular disease . . . it is quite reasonable from a medical standpoint to express the opinion . . . that the benzene fumes would have had an aggravating or deleterious effect on his condition." Dr. Eric Comstock, a medical toxicologist, testified regarding the harmful effects of benzene on the human body. Specifically, Dr. Comstock testified that six to eight weeks of exposure to benzene at a time could precipitate the chronic effects of poisoning. The ship's log revealed that during his employment, Smith complained of chest pains, shortness of breath, and general discomfort, symptoms consistent with benzene poisoning and heart disease.

The defendants contend that Smith's cardiovascular disorder could not have been aggravated because he was exposed to benzene for a maximum of only nine days. But, as noted, the district judge found that Smith was exposed to benzene for at least 41 days. Based on a finding of a minimum of 41 days of exposure, the medical testimony supports the district judge's conclusion that Smith's exposure to benzene "directly result[ed] in his eventual demise".[8]

Nevertheless, the defendants assert that there is no evidence in the record to show that the vessel was unseaworthy or that the defendants failed to exercise reasonable care in handling the benzene cargo. We disagree.

Under general maritime law, a shipowner has a duty to provide a seaworthy vessel. *Mitchell v. Trawler Racer, Inc.,* 1960, 362 U.S. 539, 549, 80 S.Ct. 926, 932, 4 L.Ed.2d 941, 947–48; *Seas Shipping Co. v. Sieracki,* 1946, 328 U.S. 85, 87, 94–95, 66 S.Ct. 872, 877, 90 L.Ed. 1099, 1102, 1105–06; *Weeks v. Alonzo Cothron, Inc.,* 5 Cir. 1972, 466 F.2d 578, 581. Under the seaworthiness doctrine, a ship owner is liable for the death of an individual proximately caused by failure to furnish a vessel reasonably fit for its intended purposes. The defendants' duty to protect Smith against the hazards of maritime services was absolute and included an obligation to provide Smith "a safe place in which to work". *Vickers v. Tumey,* 5 Cir. 1961, 290 F.2d 426, 430. The defendants' failure to perform this duty "no matter what the excuse" was a breach of the duty of seaworthiness. *Id.*

The defendants' duty of seaworthiness encompassed an obligation to furnish the decedent safe living and working quarters. That the defendants, in handling the benzene cargo, may have complied with pertinent statutes, Coast Guard regulations, and industry practices, does not compel a finding of seaworthiness if the vessel was in fact unsafe for crewmembers. *See Weeks v. Alonzo Cothron, Inc.,* 5 Cir. 1972, 466 F.2d 578, 583; *Stevens v. Seacoast Co.,* 5 Cir. 1969, 414 F.2d 1032, 1039. Here, the presence of toxic concentrations of benzene fumes in the living and working areas of the FOGG rendered the vessel unsafe for crewmembers and constituted a breach of the duty of seaworthiness.

In addition to the general maritime duty of seaworthiness, the defendants owed Smith a duty of reasonable care under the Jones Act, 46 U.S.C. § 688, at all times during the course of Smith's employment as a seaman, and under the Death on the High Seas Act, 46 U.S.C. §§ 761–768 while the FOGG cruised nonterritorial waters.[9] DOHSA also provides seamen a remedy for

---

8. The defendants raise as a point of error the district court's exclusion of testimony regarding the health of FOGG crewmembers other than Smith. Although the district judge stated in his findings that the ship's log revealed that other crewmembers complained of benzene exposure, the health of Smith's fellow crewmembers was a peripheral issue. The trial court has discretion to exclude evidence relating to collateral issues. *Laitram Corp. v. Deepsouth* *Packing Co.,* 5 Cir. 1971, 443 F.2d 928, 935; *Patterson v. McWane Cast Iron Pipe Co.,* 5 Cir. 1964, 331 F.2d 921, 923.

9. Nonterritorial waters are high seas beyond a marine league (three nautical miles) from the shore of any state, or the District of Columbia, or the territories, or dependencies of the United States. 46 U.S.C. § 761.

unseaworthiness on the high seas.[10] The defendants argue that there is no evidence that their negligence or the negligence of their employees caused Smith's benzene poisoning. Specifically, the shipowners assert that the intermittent release of benzene fumes from the FOGG's storage tanks and equipment during loading, unloading, and cleaning was unavoidable and not caused by their negligent conduct.

This argument is unpersuasive. Under the Jones Act a seaman's employer is liable if his negligence played any part, even the slightest, in producing the seaman's death. *McIlwain v. Placid Oil Co.,* 5 Cir. 1973, 472 F.2d 248, 250 n. 1 (citing *Ferguson v. Moore-McCormack Lines, Inc.,* 1957, 352 U.S. 521, 523, 77 S.Ct. 457, 458, 1 L.Ed.2d 511, 514); *see Spinks v. Chevron Oil Co.,* 5 Cir. 1975, 507 F.2d 216, 221. Assuming that the ship's captain was unable in the exercise of reasonable care to prevent the escape of minimal quantities of benzene from the tanks during loading and cleaning, the defendants still had a duty to use reasonable care to prevent the contamination of the crew's quarters and other working areas of the ship. Witnesses testified as to the presence of benzene fumes in the ship's living quarters. The evidence supports the trial judge's conclusion that the ship's ventilation system was responsible, in part, for the contamination of the crew's quarters. Medical testimony shows that benzene concentrations were on occasion at least ten times the acceptable level for normal working conditions. The record reveals that the ship's captain and other officers were aware of the problems created by the ship's ventilation system. The crew also was endangered, according to the Coast Guard report, because defective seals in the cargo pumps allowed benzene to accumulate in the ship's pump room. Crewman Mapes stated that fumes from the pump room entered the air conditioning ducts that ventilated the crew's quarters. Under the clearly erroneous rule, this evidence is sufficient to require that we uphold the district court's finding that the defendants breached their duty of care to provide Smith a safe living and working environment aboard the FOGG.

We have, therefore, an unusual situation. The acts and omissions to act which support a finding of negligence under the Jones Act were also a cause of the FOGG's unseaworthy condition.[11]

## II.

Several weeks after Smith's death, an explosion aboard the FOGG caused the vessel to sink. The Coast Guard investigated the disaster. Although the investigation focused primarily on the cause of the explosion, the Coast Guard's report discussed the properties of benzene. The report included factual findings concerning the conditions under which benzene was transported aboard the FOGG and the causes of benzene contamination aboard the ship.

The district court admitted into evidence, over the defendants' objection, excerpts from the Coast Guard Marine Board of Investigation Report. (Plaintiff's Exhibits 2 and 3). On appeal, the defendants argue that both exhibits were irrelevant and therefore inadmissible. In the alternative, the defendants contend that the exhibits did not qualify for the hearsay exception for public records and reports. *See* Fed.R. Evid. 803(8).

Although the Coast Guard report examined the possible causes of the explosion aboard the FOGG, the report satisfied the test for relevance under Federal Rule of Evidence 401. Rule 401 defines as relevant

10. 46 U.S.C. § 761; *Moragne v. States Marine Lines, Inc.,* 1970, 398 U.S. 375, 396 n. 12, 90 S.Ct. 1772, 1785, n. 12, 26 L.Ed.2d 339, 354 n. 12; *In re Dearborn Marine Service, Inc.,* 5 Cir. 1974, 499 F.2d 263, 270 & n. 10.

11. We do not imply, of course, that the negligence of a Jones Act employer necessarily renders a vessel unseaworthy under general maritime law. *Cf. Usner v. Luckenbach Overseas Corp.,* 1971, 400 U.S. 494, 498–99, 91 S.Ct. 514, 516–517, 27 L.Ed.2d 562, 566–67. In this case, however, the defendants' negligent failure to protect the decedent against the emission of benzene fumes contributed to the unsafe condition of the vessel.

any evidence tending to prove or disprove a fact pertinent to the issues in a case.[12] Since the Coast Guard report discussed the properties of benzene, the chemical's effects on the human body, and the conditions under which the FOGG transported benzene, the report was relevant to the question whether benzene exposure was a contributing cause of Smith's death. The trial judge expressly disregarded irrelevant statements in the report concerning the cause of the explosion aboard the FOGG.

Plaintiff's Exhibits 2 and 3, to be admissible, must satisfy the hearsay exception for public records and reports. Federal Rule of Evidence 803(8)(C) provides a hearsay exception in civil actions for "factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness". The Coast Guard is authorized under 46 U.S.C. § 239 to investigate and determine the cause of marine casualties involving loss of life. Reports prepared in conjunction with an authorized Coast Guard investigation are public records.[13] Since 46 U.S.C. § 239 authorized the Coast Guard to investigate the sinking of the FOGG, the factual findings in the report are admissible under Rule 803(8), provided that the relevant cir-

cumstances do not indicate lack of trustworthiness.[14]

The legislative history of Rule 803(8) reveals a difference of opinion as to the meaning of "factual findings". *Complaint of American Export Lines, Inc.,* S.D.N.Y. 1977, 73 F.R.D. 454, 457. The House Committee on the Judiciary intended that "factual findings" be strictly construed and that evaluations and opinions contained in reports should not be admissible.[15] The Senate Judiciary Committee recommended a more liberal interpretation of "factual findings" so as to include evaluative reports.[16] The Notes of the Advisory Committee on Proposed Rules also recommended that "factual findings" encompass evaluative reports, provided that the report possesses sufficient indicia of trustworthiness.[17]

In deciding how to interpret "factual findings" in the context of this case, we find instructive reasoning in *Complaint of American Export Lines, Inc.,* S.D.N.Y.1977, 73 F.R.D. 454, concerning the admissibility of a Coast Guard Marine Board of Investigation Report at a civil trial. First, the language of Rule 803 suggests that "factual findings" defines something other than "opinions" and "diagnoses" which are admissible under Rule 803(6) when contained in the records of "a regularly conducted

---

**12.** Federal Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence".

**13.** 46 U.S.C. § 239(a).

**14.** The defendants, citing the common law rule as stated in *Steward v. Atlantic Refining Co.,* 3 Cir. 1957, 240 F.2d 715, 717, argue that Coast Guard Marine Board of Investigation reports concerning maritime disasters are not admissible in subsequent civil actions. *See also The Charles Morgan,* 1885, 115 U.S. 69, 77, 5 S.Ct. 1172, 29 L.Ed. 316. Title 46 U.S.C. § 239 authorizing investigations of marine disasters, however, places no such restriction on the use of Coast Guard investigative reports. Federal Rule of Evidence 803(8), adopted by Congress after the *Steward* case, must be read as superseding the judicial restrictions on the use of Coast Guard investigative reports to the extent that "factual findings" are concerned. *Com-*

*plaint of American Export Lines, Inc.,* S.D.N.Y. 1977, 73 F.R.D. 454, 457 n. 3.

**15.** H.R.Rep. No. 93–650, Note to Rule 803(8), *reprinted in* Fed.R.Evid., 28 U.S.C.A. at 580 (1975).

**16.** S.Rep. No. 93–1277, Note to Rule 803(8), *reprinted in* Fed.R.Evid., 28 U.S.C.A. at 581 (1975).

**17.** Advisory Committee Notes to Rule 803(8), *reprinted* in 28 U.S.C.A. at 590 (1975). According to the Advisory Committee:

Factors which may be of assistance in passing upon the admissibility of the evaluative reports include: (1) the timeliness of the investigation, McCormick, Can the Courts Make Wider Use of Reports of Official Investigations? 42 Iowa L.Rev. 363 (1957); (2) the special skill or experience of the official, *id.,* (3) whether a hearing was held and the level at which conducted, *Franklin v. Skelly Oil Co.,* 141 F.2d 568 (10th Cir. 1944) . . . . . .

business activity". *Id.* at 457. Rule 803(8), although similar to Rule 803(6), substitutes the term "factual findings" for "opinions" and "diagnoses". Since these terms are used in similar context within the same Rule, it is logical to assume that Congress intended that the terms have different and distinct meanings. *Id.* Second, Coast Guard regulations governing marine investigations expressly state that the investigations " 'are for the purpose of taking appropriate measures for promoting of life and property at sea, and *are not intended to fix civil or criminal responsibility.'* 46 C.F.R. § 407–1(b) . . . ". *Id.* at 458 (emphasis in original). *Complaint of American Export Lines* regarded

> the fact that the Coast Guard itself, in establishing the investigation mechanism, did not intend a resulting report to "fix civil . . . responsibility" to be the type of "negative factor" which the Advisory Committee has suggested should weigh against the evidentiary use of any evaluative conclusions or opinions contained in such a report.

*Id.* at 458.

Because of the experience and expertise of the Coast Guard in investigating marine disasters, the timeliness of the investigation in this case, and the impartiality of the Coast Guard, we find the Coast Guard report sufficiently trustworthy to justify the district court's admission of the report's findings of fact. There was no reason for the Coast Guard to have been other than objective. Under *Complaint of American Export Lines,* however, evaluative conclu-

18. *See* Fed.R.Evid. 803(18).

19. When the plaintiff's attorney, Mr. Epstein, was attempting to introduce Exhibits 2 and 3, the following dialogue took place:

MR. CHEAVENS [attorney for defendants]: We object to the prior offer on the grounds those are simply excerpts from other publications. They show no particular government expertise on the matter.

THE COURT: Do you want to introduce the whole report?

MR. CHEAVENS [sic—apparently this should read MR. EPSTEIN]: No, Your Honor.

THE COURT: Same Ruling.

sions and opinions of the Coast Guard Marine Board of Investigation contained in the report should not have been admitted into evidence.

Specifically, we hold that the trial court properly admitted the excerpt from the Coast Guard report designated Plaintiff's Exhibit 2. Plaintiff's Exhibit 2, entitled "Characteristics of Benzene Under Shipboard Conditions", contained data regarding the chemical properties of benzene gas and a description of the means by which the FOGG transported benzene. The exhibit describes the benzene cargo tanks aboard the FOGG, defects in the FOGG's equipment, and causes of benzene contamination of the FOGG's crew's quarters. We interpret Plaintiff's Exhibit 2 as Coast Guard findings of fact. Plaintiff's Exhibit 2 does not include Coast Guard opinions as to liability, conclusions as to the cause of the FOGG's sinking, or recommendations regarding how to avoid similar disasters in the future.

The defendants' objection, however, to the admissibility of a quote in Plaintiff's Exhibit 2 from Volume 3 Kirk-Othmer, *Encyclopedia of Chemical Technology,* 395–96 (1964), is well taken. The quote from *Encyclopedia of Chemical Technology* is double hearsay. The plaintiff made no attempt to introduce this quote under the hearsay exception for learned treatises.[18] Our review of the transcript reveals, however, that the district judge disregarded language in Plaintiff's Exhibit 2 that was quoted from other sources.[19]

We interpret the district judge's remark "same ruling" to mean that he would disregard the objectionable portion of the exhibit just as he had deleted Section 13 in Plaintiff's Exhibit 2 entitled "Electrostatic Phenomena" in response to an earlier objection by the attorney for the defendants.

Assuming, however, that the district court did improvidently consider the quote from *Encyclopedia of Chemical Technology* regarding the harmful effects of benzene exposure, we hold that no reversible error occurred. The information in the quote was cumulative. The plaintiff presented a plethora of medical testimony regarding the harmful effects of benzene and the cause of the decedent's death, as well as substantial testimony from crewmembers as

The defendants object to the admission of Plaintiff's Exhibit 3 on the ground that the exhibit contains conclusions of the Coast Guard Marine Board of Investigation.[20] This exhibit reiterates the factual findings contained in Plaintiff's Exhibit 2 regarding the decedent's benzene exposure. To the extent the exhibit repeats the factual findings of Plaintiff's Exhibit 2, Exhibit 3 is admissible. The exhibit does contain a conclusion that the emission of benzene fumes from the cargo tanks aboard the FOGG was partially the result of deficient Coast Guard regulations applicable to the transportation of benzene. The report also recommended an amendment to the regulations to improve the control of noxious cargo fumes. Although these conclusions were not admissible under Rule 803(8) as "factual findings", they had no bearing on the issues in this case, and could not have affected the district court's findings. The district court, therefore, did not commit reversible error in admitting Exhibit 3 in its entirety.

### III.

Another issue raised by this appeal is whether the district court properly awarded the plaintiff damages for loss of society.[21] The district judge made express findings of negligence and unseaworthiness, but his opinion does not state whether the defendants were liable under the Jones Act, DOH-SA, or general maritime law. Since damages for nonpecuniary claims are not recoverable under the Jones Act[22] or DOHSA,[23] we must determine whether the district court's finding of unseaworthiness supports recovery of damages for loss of society under general maritime law. Resolution of this question turns upon the application of several recent decisions to the peculiar facts of this case.

The law applicable to admiralty wrongful death actions has undergone considerable judicial scrutiny in recent years.[24] Our analysis of these cases begins with *Moragne v. States Marine Lines, Inc.,* 1970, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339. In *Moragne,* the Supreme Court recognized for the first time a federal remedy for wrongful death based on the general maritime law. Specifically, *Moragne* permitted recovery under the unseaworthiness doctrine for a death in territorial waters. Prior to *Moragne,* federal maritime death actions could be brought only under the Jones Act and DOHSA. The Jones Act established a cause of action for the death of a seaman based on the direct or vicarious negligence of his employer; it did not recognize unseaworthiness as a basis of recovery. 398 U.S. at 395, 90 S.Ct. 1772. DOHSA provided a remedy for the wrongful death of any person resulting from negligence or unseaworthiness on the high seas, but recognized

to the presence of benzene aboard the FOGG. "In non-jury cases an appellate court will not reverse for the erroneous reception of evidence unless there is an insufficiency of competent evidence, or the trial court was induced by incompetent evidence to make an essential finding it would not otherwise have made." *Cain v. Commissioner of Internal Revenue,* 5 Cir. 1972, 460 F.2d 1243, 1244.

**20.** Plaintiff's Exhibit 3 reads in its entirety as follows:

27.(12) *Exposure to Benzene:*
This Board has found that the crewmembers on the SS V.A. FOGG were repeatedly exposed to benzene vapors in harmful concentrations. Exposure was caused by fumes emitted from several sources while washing and gas freeing cargo tanks. Exposure also occurred when fumes were emitted from vents and open ullage openings while loading ballast or cargo. The SS V.A. FOGG was certificated for the carriage of grade "B" and lower flammable and combustible liquids and its cargo tank venting system was configured in accordance with applicable regulations. In view of the above, it is concluded that there is a need for an amendment to the tank vessel regulations which would correct this apparent deficiency and which would control this source of noxious fumes.

**21.** See note 2 *supra.*

**22.** See *Ivy v. Security Barge Lines, Inc.,* 5 Cir. en banc 1977, 606 F.2d 524.

**23.** See *Mobil Oil Corp. v. Higgenbotham,* 1978, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581.

**24.** See generally Swaim, *Requiem for* Moragne: *the New Uniformity,* 25 Loy.L.Rev. 1 (1979).

no cause of action for a death caused by unseaworthiness in territorial waters.[25]

Before *Moragne,* when a nonseaman was killed in territorial waters, state statutes provided the only wrongful death remedies. If a seaman was killed in territorial waters by unseaworthiness, his beneficiaries could not sue the vessel owner because the Jones Act preempted applicable state death statutes.[26] *Moragne,* by establishing a federal cause of action for a death in territorial waters caused by unseaworthiness, filled a void in the scheme of federal maritime remedies left by the Jones Act and DOHSA. The *Moragne* Court noted that "[o]ur recognition of a right to recover for wrongful death under general maritime law will assure uniform vindication of federal policies . . . .". *Id.* at 401, 90 S.Ct. at 1788. *Moragne* did not discuss the proper measure of damages under the new cause of action of whether the cause of action extended beyond territorial waters.

In *Sea-Land Services, Inc. v. Gaudet,* 1974, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9, the Supreme Court partially resolved the damage question left open in *Moragne. Gaudet* involved a general maritime wrongful death action based on unseaworthiness. There the Court held that the dependents of a longshoreman killed in territorial waters could recover damages for loss of support, services, and society, as well as funeral expenses.[27] By permitting the recovery of damages for loss of society, *Gaudet* aligned federal maritime wrongful death recovery with a majority of the state wrongful death statutes. 414 U.S. at 587–88, 94 S.Ct. 806. *Gaudet* was significant since Congress limited wrongful death awards under DOHSA to damages for pecuniary claims. *Id.* at 586–87, 94 S.Ct. 806.

Although the *Gaudet* decision was broadly written, the Supreme Court later expressly limited the holding of the case to deaths in territorial waters. *See Mobil Oil Corp. v. Higgenbotham,* 1978, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581. In *Higgenbotham,* survivors of airplane passengers killed outside state territorial waters sought to recover damages for nonpecuniary claims under general maritime law in addition to damages under DOHSA. The *Higgenbotham* Court recognized the value of uniformity of recoveries in maritime actions, but held that the explicit statutory limitation on recovery in high seas death actions to pecuniary losses prevented an extension of the *Moragne*-remedy beyond territorial waters. 436 U.S. at 625, 98 S.Ct. 2010. The decision did not question, however, the *Gaudet* holding that damages for loss of society are recoverable for a death resulting from an injury sustained in territorial waters. *Id.* at 623–24, 98 S.Ct. 2010.

Recently this Court considered whether the survivor of a Jones Act seaman killed in territorial waters could recover damages for loss of society in an action where liability is based solely on the negligence of the seaman's employer. *Ivy v. Securities Barge Lines, Inc.,* 5 Cir. en banc 1979, 606 F.2d 524. Although the Jones Act is silent on the issue of damages, cases before *Ivy* consistently limited recovery under the Jones Act to damages for pecuniary claims.[28] Of special importance to the *Ivy* Court was whether *Gaudet,* by permitting the recovery of damages for loss of society in *Moragne*-type unseaworthiness cases, altered the traditional recovery rule in Jones Act negligence cases. The *Ivy* Court, after noting

25. 46 U.S.C. § 761.

26. *Moragne v. States Marine Lines, Inc.,* 398 U.S. at 395–96 & n. 12, 90 S.Ct. 1772; *see* Maraist, *Maritime Wrongful Death —Higgenbotham Reverses Trend and Creates New Questions,* 39 La.L.Rev. 81, 84 (1978).

27. *Sea-Lands Services, Inc. v. Gaudet,* 1974, 414 U.S. 573, 584–85, 94 S.Ct. 806, 814, 39 L.Ed.2d 9, 20–21.

28. *See, e. g., In re M/V Elaine Jones,* 5 Cir. 1973, 480 F.2d 11, 32, *reh. granted,* 513 F.2d 911, *cert. denied,* 1975, 423 U.S. 840, 96 S.Ct. 71, 46 L.Ed.2d 60; *Cities Service Oil Co. v. Launey,* 5 Cir. 1968, 403 F.2d 537, 540; *Igneri v. Cie. de Transports Oceaniques,* 2 Cir. 1963, 323 F.2d 257, 266, *cert. denied,* 1964, 376 U.S. 949, 84 S.Ct. 965, 11 L.Ed.2d 969; *Sabine Towing Co. v. Brennan,* 5 Cir., 85 F.2d 478, 481, *cert. denied,* 1936, 299 U.S. 599, 57 S.Ct. 191, 81 L.Ed. 441.

that *Moragne* and *Gaudet* did not involve Jones Act seamen, reasoned that the rules governing damages in general maritime law or changes in those rules could not alter the traditional Jones Act remedy. Next the *Ivy* Court concluded that since *Higgenbotham* limited DOHSA recovery to damages for pecuniary claims, a similar restriction necessarily should apply to Jones Act recovery on the high seas. *Id.* at 528–29. A finding that survivors could recover damages for loss of society as a result of the death of a Jones Act seaman in territorial waters would be illogical, said the *Ivy* Court, in light of the fact that damages for nonpecuniary claims could not be recovered under the same statute for a death occurring on the high seas. *Id.* Thus the *Ivy* Court held that survivors of a seaman may not recover damages for nonpecuniary claims under the Jones Act in an action based only upon the negligence of the master of a vessel.

Dicta in *Ivy* states that in a negligence action Jones Act recovery may not be supplemented by *Moragne-Gaudet* recovery. *Id.* at 527. *Ivy* expressly stated, however, that the decision did not reach the precise question raised by this appeal: After *Higgenbotham*, in an action based on unseaworthiness under general maritime law and negligence under the Jones Act, may damages for loss of society be recovered upon a finding of unseaworthiness? *Id.* at 528 n.8. The *Ivy* case does not provide guidance as to whether a seaman who recovers damages for pecuniary claims under the Jones Act may also recover damages for nonpecuniary

claims under general maritime law upon proof of unseaworthiness. This is not a question of first impression for this Court. In *Landry v. Two R. Drilling Co.*, 5 Cir. 1975, 511 F.2d 138, *rehearing denied*, 517 F.2d 675, this Court expressly stated that the *Moragne* wrongful death remedy extends to deaths of Jones Act seamen in territorial waters. 517 F.2d at 676. Accordingly, *Landry* held that "where . . there is liability under both a Jones Act claim and a general maritime claim for unseaworthiness . '. . *Gaudet* damages [are] proper". 511 F.2d at 143. *See M/V Elaine Jones v. Griffith*, 5 Cir. 1975, 513 F.2d 911, 912–13; *McDonald v. Federal Barge Lines, Inc.*, 5 Cir. 1974, 496 F.2d 1376, 1377–78. In *Ivy* liability was based only on the Jones Act; there was no finding of unseaworthiness. *Ivy*, therefore, neither expressly nor impliedly limited the rule of *Landry*.

The *Landry* holding also is consistent with the recent Supreme Court cases dealing with the federal maritime wrongful death remedy.[29] In *Moragne*, for instance, the Supreme Court noted in dicta that traditionally a seaman's right under general maritime law to sue his employer for injuries caused by unseaworthiness existed alongside his Jones Act rights. *Moragne v. States Marine Lines*, 398 U.S. at 396 n. 12, 90 S.Ct. 1772. The *Moragne* Court further remarked that the newly created federal maritime wrongful death remedy seemed to be beyond the preclusive effect of the Jones Act.[30] *Id.* *Gaudet*, in permitting recovery for loss of society, also acknowledged that

---

**29.** *Cf. Public Administrator v. Angela Compania Naviera, S.A.*, 2 Cir. 1979, 592 F.2d 58. In analyzing the effect of *Moragne, Gaudet,* and *Higgenbotham*, the Second Circuit stated:

Read together, these three recent Supreme Court decisions stand for the following proposition: when a death is caused outside territorial waters, and when a wrongful death action is brought under the general maritime law, federal courts should be guided by the Death on the High Seas Act as to the subsidiary elements of that cause of action; where a death is caused inside territorial waters, however, and a wrongful death action is brought under the general maritime law, the subsidiary elements of the cause of action may be

different from or broader than those delineated in the Death on the High Seas Act. . . *Id.* at 63.

**30.** The *Moragne* Court distinguished the holding of *Gillespie v. United States Steel Corp.*, 1964, 379 U.S. 148, 85 S.Ct. 308, 13 L.Ed.2d 199, that the Jones Act supersedes death actions of the states. *Moragne v. States Marine Lines, Inc.*, 398 U.S. at 354, n. 12, 90 S.Ct. 1772. *Gillespie*, said the *Moragne* Court, dealt with the preclusion of a state remedy by a federal statute; "no question of preclusion of a *federal* remedy was before the Court in *Gillespie* . . .". 398 U.S. at 396 n. 12, 90 S.Ct. at 1785. (emphasis in original).

the maritime wrongful death remedy, in certain instances, may be joined with a claim based on the Jones Act. *Sea-Land Services, Inc. v. Gaudet*, 414 U.S. at 589 n. 24, 94 S.Ct. 806 (citing *Moragne v. States Marine Lines*, 398 U.S. at 396 n. 12, 90 S.Ct. 1772).

■ *Higgenbotham* made clear that the *Moragne* remedy did not extend beyond territorial waters, since Congress already had provided a remedy for death of any individual killed by negligence or unseaworthiness on the high seas. *Higgenbotham* did not disturb the application of the *Moragne* remedy to deaths in territorial waters. Furthermore, *Higgenbotham*, by stating "that the measure of damages in coastal waters will differ from that on the high seas", implicitly reaffirmed the *Gaudet* recovery. 436 U.S. at 624, 98 S.Ct. at 2015. In sum, we conclude that *Landry v. Two R. Drilling Co.*, 5 Cir. 1975, 511 F.2d 138, *rehearing denied*, 517 F.2d 675, is still valid and is controlling in this case. When a death is caused in territorial waters by unseaworthiness, the survivors of a seaman may recover damages for a loss of society under general maritime law in addition to any recovery permitted by the Jones Act.[31]

### IV.

■ An unusual factual twist in this case prevents us from cursorily holding that Mrs. Smith is entitled to damages for loss of society. In this case, unlike the others we have discussed, it is impossible to determine from the record where the injury occurred that precipitated the wrongful death. Smith died as a result of cumulative benzene exposure that lasted anywhere from 41 to 161 days. During this period, the FOGG cruised the high seas as well as territorial waters. It cannot be said that

Smith suffered his fatal injury while the FOGG was discharging and loading benzene at ports in territorial waters or while the vessel cruised the high seas. In view of the medical testimony that six to eight weeks of exposure was necessary to aggravate Smith's pre-existing heart disorder, Smith's progressive benzene poisoning necessarily must have occurred both in coastal waters and on the high seas.

Had Smith's fatal injury been inflicted entirely in territorial waters as a result of the Fogg's unseaworthiness, we would be required, on the basis of *Landry*, to uphold the district court's damage award. Since Smith was entitled to a duty of seaworthiness under general maritime law at all times during which the FOGG cruised territorial waters, it would be illogical and unfair to deny recovery of damages for loss of society because Smith's fatal indivisible injury was inflicted only partially in coastal waters. We hold, therefore, that when a seaman dies from an indivisible injury caused in part by unseaworthiness and inflicted over a period during which the vessel of which he is a member of the crew cruised coastal waters and the high seas, the seaman's survivors may recover damages for loss of society under general maritime law in addition to any damages recoverable under the Jones Act or DOHSA.* The judgment of the district court is AFFIRMED.

---

31. We take exception to the conclusion of commentators that after *Higgenbotham*, survivors of a Jones Act seaman killed in territorial waters may not recover *Moragne-Gaudet* damages. *See, e. g.*, Schill, *Available Forums and Recoverable Damages in Offshore Personal Injury Litigation in the Fifth Circuit*: a Review and an Analysis, 16 Hous.L.Rev. 1, 11 (1978); Note, 53 Tul.L.Rev. 254, 263 (1978).

* Our holding is in accord with the recent decision of this Court in *Hlodan v. Ohio Barge Lines, Inc.*, 5 Cir. 1980, 611 F.2d 71. *Hlodan* also permitted recovery of damages for loss of society under general maritime law where the death of a Jones Act seaman in territorial waters was caused by negligence and unseaworthiness.