Barbara Ann WALKER, individually, and John Scott Walker and Samantha Leigh Walker, minors, by Barbara Ann Walker, their Guardian ad Litem, Plaintiffs,

v.

FAIRCHILD INDUSTRIES, INC., Defendant.

No. Civ. LV 81–540 RDF.

United States District Court, D. Nevada.

Dec. 1, 1982.

Gary Logan, Las Vegas, Nev., for plaintiffs.

William S. Barker of Cromer, Barker, Michaelson, Gillock & Rawlings, Las Vegas, Nev., for defendant.

DECISION RE PLAINTIFFS' MOTION FOR EARLY DETERMINATION OF THE ADMISSIBILITY INTO EVIDENCE OF USAF AIRCRAFT ACCIDENT INVESTIGATION REPORT

ROGER D. FOLEY, Senior District Judge.

## I. *Facts*

This lawsuit arises out of an air crash which occurred at Nellis Air Force Base, Nevada, on July 10, 1981. Plaintiffs' decedent, Capt. Samuel S. Walker, USAF, was killed while piloting a USAF A–10 series aircraft, SIN 75–0302, manufactured by defendant Fairchild Industries, Inc. The plaintiffs, Walker's widow and two minor children, are claiming that the aircraft and its component parts were dangerously defective and the said defects were the proximate cause of the death of plaintiffs' decedent. The defendant's main defense is pilot error.

Plaintiffs have moved for an early determination of the admissibility into evidence of a USAF Aircraft Accident Investigation Report. The defendant objects to the admissibility of portions of that report.

## II. *Applicable Law*

It is plaintiffs' contention that the subject report should be admitted into evidence at trial because it falls within the public records exception to the general hearsay rule. Rule 803(8) of the Federal Rules of Evidence (FRE) states:

"Public records and reports.—Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness."

A leading case in this area is *Fraley v. Rockwell Intern. Corp.*, 470 F.Supp. 1264 (S.D.Ohio 1979). The case arose out of an airplane crash in which a Lt. R.M. Fraley, United States Navy, and a trainee were killed. The airplane was manufactured by

Rockwell International Corporation. The United States Navy issued two reports on the crash. The first report discussed the general circumstances surrounding the crash and was prepared by the Judge Advocate General's Office. The second report was prepared by the Naval Rework Facility at Alameda, California, and contained conclusions about the cause of the crash which were developed from engineering analysis based upon the airplane wreckage. In *Fraley*, the Court gave the following excellent summary of the law in this area:

> In practice, four criteria must be satisfied for Rule 803(8)(C) to apply. First, the hearsay statement contained in the public document must constitute a factual finding. Second, the factual finding must have resulted from an investigation authorized by law. Third, the declarant must have had first-hand knowledge of the matter asserted. Fourth, the hearsay statement must be trustworthy.
>
> The first criterion is satisfied when the public document is either a finding of fact that was established by direct evidence or a finding of fact that was established by circumstantial evidence. *Baker v. Elcona Homes Corp.*, 588 F.2d 551 (6th Cir.1978).
>
> . . . .
>
> The second criterion is satisfied if the investigation upon which the public document is based was sanctioned by law. Although Rockwell argues that the investigation must be required by law, the language of Rule 803(8) suggests otherwise. Section "B" of Rule 803(8), which does require that the underlying investigation be required by law, uses the language " . . . as to which matters there was a duty to report . . ." to convey this message. By contrast, Section "C" of Rule 803(8) provides that the investigation need only be " . . . made pursuant to authority granted by law." It would seem that the drafters of the rule would have used identical language in both Sections if investigations covered under Section "C" had to be required by law, rather than merely permitted by it.

> The third criterion can be satisfied in either of two ways. Ideally, the author of the document actually will have had first-hand knowledge of the factual findings which he has made. However, if he does not, the first-hand knowledge requirement imposed by Federal Rule of Evidence 602 still can be satisfied if the author had first-hand knowledge of the statements made by declarants who did have first-hand knowledge of the facts mentioned in the factual findings made in the public document.
>
> Satisfaction of the final criterion depends, to a large extent, upon the court which is reviewing the evidentiary problem. Nevertheless, there are at least four factors which most courts review in making a determination of trustworthiness. These are: (1) the timeliness of the investigation; (2) the special skill or experience of the official who conducted the investigation and who reported it; (3) whether a hearing was held on the level at which the investigation was conducted; and (4) possible motivational problems. See *Baker, supra*.
>
> It should be noted that a public report which satisfies all of these criteria still may be inadmissible. If the factual findings in the public document themselves are based upon hearsay, then the underlying hearsay also must fit within an exception to the general hearsay rule for the public document to be admissible. *Fed.R. Evid.* 805. Therefore, whenever public documents are offered into evidence, the first inquiries always should be whether the factual findings in the public documents rest upon hearsay and, if so, whether that hearsay is excepted from the general hearsay rule.

(Supra at 1266–67.)

The Court held that the first report prepared by the Judge Advocate General's Office lacked trustworthiness due to the inexperience of the investigator and therefore denied its admission. As for the second report, the Court admitted it on the basis that the factual findings made by the author of the report were based on firsthand knowledge of statements made by witnesses

who did have firsthand knowledge of the facts mentioned in the report. Supra at 1268.

In another case in which the same documents were examined, *Sage v. Rockwell International Corp.,* 477 F.Supp. 1205, 1209–10 (D.N.H.1979) (the trainee), the Court also admitted the first report on the basis that the inexperience of the investigator went to the weight of the report, without denying the admissibility of the evidence. In *Sage,* the Court gave the following analysis of why these reports should usually be admitted:

> The type of record covered by subdivision (C)—"factual findings resulting from an investigation made pursuant to authority granted by law" had a mixed reception prior to the adoption of the Federal Rules. Part of this was undoubtedly due to the courts' reluctance to admit reports not completely based on personal knowledge, without however, analyzing the rationale for requiring personal knowledge in investigative situations. Courts saw only that the officer's conclusions were frequently based on information furnished by someone else. Wigmore argued that when there was a duty to investigate, this duty carried with it sufficient guaranties of trustworthiness to override the general principle that a witness must have firsthand knowledge. McCormick, a strong advocate of the desirability of admitting investigative reports, explained why they were ordinarily reliable:

> "The following are some of the reasons for receiving the investigative report as evidence so far as the report is within the duty of the officer making it including those portions based on what he is told by those who claim to know and including his conclusions. The most important reason is time. The officer comes on the scene usually as early as it is feasible to get there. Usually the investigators of the parties come later and the statements are frequently partial and one-sided. The witnesses at the trial have often only a dim recollection of the event and their testimony rests mostly on their pre-trial

refreshment of memory by these statements. The officer is often able to interview witnesses before they have been pulled one way or the other by the parties. The officer, too, is frequently a specialist—a doctor reporting death, a fire marshall investigating a fire—or at least experienced in like investigations, such as a highway patrolman reporting on a collision."

(Supra at 1209–10.)

However, it should be noted that the Court, in *Sage,* withheld a ruling until time of trial on the Aircraft Mishap Board Report, the same type of report that is the subject of this motion. Id. at 1210.

A few other problems with this area of the law should also be addressed. While the question of whether a hearing was held as part of the investigation is a factor listed in the determination of trustworthiness, it is not required if the investigation is a complete one and the report meets the other tests for trustworthiness. *Baker v. Elcona Homes Corp.,* 588 F.2d 551 (6th Cir.1978). Another area of some dispute is whether evaluative opinions contained in a report are admissible into evidence as "factual findings" pursuant to Rule 803(8)(C). The prevailing view is that all evaluative conclusions are within the scope of Rule 803(8)(C). *Baker v. Elcona Homes Corp.,* 588 F.2d 551 (6th Cir.1978); *Melville v. American Home Assurance Corp.,* 584 F.2d 1306 (3rd Cir. 1978); *Sage v. Rockwell International Corp.,* 477 F.Supp. 1205 (D.N.H.1979); contra, *Smith v. Ithaca Corp.,* 612 F.2d 215 (5th Cir.1980). In conclusion, Rule 803(8)(C), Federal Rules of Evidence, carves out a wide exception to the hearsay rule for official investigative reports. The main issue for the Court is to determine the trustworthiness of the evidence.

### III. *The Report in Question*

The report in question is a USAF Aircraft Accident Investigation Report. The investigation and accident report was prepared pursuant to USAF Reg. 110–14. The purpose of an aircraft investigation con-

ducted in accordance with this regulation is to gather all relevant facts and records regarding a particular accident in a single report. The report is to be factual in nature and not contain opinions, conclusions and recommendations of the investigators. The major commander of the USAF organization that has incurred the mishap is responsible for making sure that an investigation under this regulation is conducted when appropriate.

In this instance, the subject investigation was conducted by an Accident Investigation Board comprised of Colonel Edsel DeVille, Major Michael Batsel and MSGT Robert Womack. These investigating officers were experienced pilots who drew upon the expertise of the USAF Aeronautical System Laboratories at Wright-Patterson Air Force Base in Ohio. Although no formal hearings were held, many witnesses were interviewed and the wreckage was thoroughly examined. The investigation commenced shortly after the aircraft mishap.

The defendant argues that certain portions of the report are untrustworthy and possibly prejudicial to the defendant and therefore should not be allowed into evidence pursuant to FRE 403. The plaintiff asserts that these objections go not so much to admissibility as to the weight and credibility of the evidence and therefore are matters for the jury to consider.

IV. *Defendant's Specific Objections (contained in Defendant's Objections to USAF Aircraft Accident Investigation Report, filed July 7, 1982)*

A. *Item 1*

The defendant objects to the second paragraph of ¶ 13 on page 4 of the report on the grounds of untrustworthiness. This section deals with the airframe and the portion objected to reads:

> "Subsequent investigation has brought to light the fact that the ballistic foam used inside the airframe could indeed cause a restriction and/or jam of the flight controls."

In a USAF letter from Colonel Keithe E. Nelson to Lt. Colonel Edsel J. DeVille appointing DeVille to officially investigate the aircraft accident which is the subject of this lawsuit, Nelson states that the report is to contain a factual summary, "but will not include your opinions, conclusions, or recommendations." (Letter appears on p. X–1 of report.)

The defendant objects to the above-quoted paragraph on page 4 of the report because it "is obviously an opinion. Further, it does not indicate the source of that opinion. It does not make reference to any of the portions of the report upon which that opinion is based."

The defendant further objects pursuant to FRE 403 that if the Court should find that this statement is not untrustworthy, it still should not be admitted "since its probative value is substantially outweighed by the danger of unfair prejudice and further would be misleading to a jury. A jury is not allowed to speculate or guess and this opinion deals with nothing more than a possibility."

The plaintiff maintains that the statement in question recounts the results of tests performed by DeVille and Paul Hundley, a flight control specialist with the Aeronautical Systems Division, Wright-Patterson Air Force Base, Ohio. "These tests conclusively demonstrate that ballistic foam when lodged immediately adjacent to a flight control bellcrank can restrict movement of the control stick and thereby preclude a pilot from actuating the ailerons in the manner desired."

■ This Court agrees with the defendant that the statement in question is an opinion. However, as stated earlier, the prevailing view is that all evaluative conclusions and opinions are within the scope of FRE 803(8)(C). In this case, the report was timely made and there is no evidence of improper motive. As stated earlier, a hearing is not required if the investigation is a complete one and the report meets the other tests for trustworthiness. This Court finds that in this instance, the issue of qualifications of the investigators goes

more to the weight and credibility of the evidence than its admissibility. Since the tests were conducted on A–10's which contained ballistic foam and the A–10 which crashed contained the ballistic foam in question, the relevance of the tests is apparent. At trial, both the plaintiff and the defendant may present expert testimony on the issue of whether a ballistic foam jam of the flight controls caused the crash in the instant case. Item 1 is admitted into evidence.

### B. *Item 2*

The defendant next challenges the qualifications of Hundley and the following portion of the subsequent paragraph on page 4 of the report as being untrustworthy:

"Mr. Paul Hundley, Wright-Patterson ASD, conducted tests at Davis Monthan AFB during 31 July 1981 through 4 August 1981. Mr. Hundley placed new ballistic foam of various sizes in the upper and lower bell-crank areas. During his tests he found that the foam did cause flight control restrictions and in some cases complete jams. (See TAB R–8) The jams from old type foam (no fibers) could be overcome. In trying to determine what happened, and why Capt Walker did not roll out of his left turn, the accident board conducted a similar test."

The defendant contends that Hundley was not qualified to perform the tests in question. In fact, both Hundley, a flight control specialist at Wright-Patterson AFB, and DeVille, a fighter pilot, admitted that there was no scientific basis for the tests and that neither was an expert in ballistic foam. The defendant also maintains that these tests did not result from an "investigation authorized by law of this accident."

■ Addressing the latter charge first, under FRE 803(8)(C), in a civil case an investigation need only be "made pursuant to authority granted by law." The investigation and accident report in the instant case was prepared pursuant to USAF Reg. 110–14. At page X–1 of the subject report appears a copy of the letter to DeVille from Colonel Nelson which appointed DeVille to "investigate and determine the facts and circumstances surrounding subject aircraft accident" pursuant to Air Force Regulation 110–14. Thus, the defendant is not correct when it charges that the investigation was not authorized by law.

This Court does not find that the qualifications of Hundley (or lack thereof) are irrelevant. Instead, this Court finds that this objection goes more to the weight and credibility of the evidence than to its admissibility. The defendant will be free to introduce at trial evidence which disputes Hundley's qualifications to perform the tests. See FRE 104(e).

■ The defendant also complains because Hundley's tests were not conducted on the aircraft in question. However, since that aircraft impacted the ground, tests relating to shifting of ballistic foam in an intact aircraft obviously could not be done. Hundley's tests were conducted on the same type of aircraft and are thus relevant. Item 2 is admitted into evidence.

### C. *Item 3*

The defendant also objects to subparagraph c. of ¶ 13 on pages 6 and 7 of the report on the grounds of trustworthiness. That subparagraph appears as follows:

"c. In order to determine if loose ballistic foam similar in size to our three samples could be found in the flight control areas, a survey was conducted by the board. This survey obtained the results of TCTO 1001 and 1002 (inspection of A–10 aircraft for loose foam and bellcranks). The results are as follows:

(1) *Ballistic Foam Results:*

(a) 354TFW Myrtle Beach AFB, SC:

Total Aircraft Inspected—80

Five aircraft were found with foam in panels W–11 & W–12.

Three aircraft with foam in W–11.

Two aircraft with foam in W–12.

Aircraft tail numbers are as follows:

| | No. of Pieces | Size |
|---|---|---|
| 77–0210 – Panel W–11 | 1 | 3″ x 10″ |
| 77–0209 – Panel W–11 | 1 | 5″ x 7″ |
| 78–0654 – Panel W–12 | 1 | ½″ |
| 77–0202 – Panel W–12 | 2 | 1″ x 6″ |
| 76–0543 – Panel W–11 | 1 | ½″ |

Bellcrank TCTO <u>1001</u> & <u>1002</u>

Aircraft

76–0543 – Lt Bellcrank – W–11 – bent.
Rt Control Cable – gouged.
77–0214 – Rt Bellcrank – W–12 – chipped.
77–0185 – Lt Bellcrank – W–11 – chafed by unknown object.

(b) 355TFW Davis Monthan, AFB, AZ:

Total aircraft inspected—92

Largest amount found on one aircraft—114 pieces.

Largest piece found—2¾ cube ft.

Smallest piece found—½″.

Bellcrank TCTO 1001 & 1002

Eight aircraft had small dents and scratches.

(c) 28TFW England AFB, Alexandria, LA:

Total aircraft inspected—51

Three aircraft were found with foam in W–11 & W–12.

79–0200—3 pieces 2″ × 5″ Loose—W–11
80–0176—1 piece medium size—W–11
79–0190—1 piece medium size—W–12
Bellcrank TCTO 1001 & 1002
79–0209—Panel F–89—1″ × 1½″

Note: Numerous pieces of foam were found throughout the airframe and in places that could cause jams of the other flight control bellcranks. However, we are reporting results from W–11 and W–12 only. (TAB R–6/7/8/9)

The defendant objects to the admission of these results on the ground they are untrustworthy. The defendant charges that damaged ballistic foam may have been broken or otherwise harmed by actions of USAF maintenance personnel, rather than having come loose because it was improperly affixed to the aircraft at the time of manufacture. The defendant maintains it is "easily discernible" whether a piece of foam has come loose or has been broken off because the foam is covered with a coating and if a piece is broken, there is no coating on the broken surface. However, the defendant charges that the subject pieces of ballistic foam from other aircraft have been disposed of, so there is no way to determine whether these loose pieces were improperly glued in place by the defendant or were broken by careless USAF maintenance personnel.

■ Even if the plaintiff were to allege that broken foam inside the aircraft was a manufacturing defect, the defendant would be entitled to know how many pieces were broken, how many came unglued and where the pieces were discovered. Evidence which does not include this information is unduly prejudicial to the defendant and will not be admitted into evidence. In addition, subsection (b) of subparagraph c. is not admissible because it does not include information on where in the aircraft the pieces were found or how many aircraft contained the loose pieces of foam. Item 3 will not be admitted into evidence for the above-stated reasons.

D. *Item 4*

The defendant next objects to the following paragraph:

"Captain Flemming, East Coast A–10 demo pilot, flew the exact profile in the HRL Lab A–10 simulator at Williams AFB in July 1981. At the same point in the demo profile (left turn to reposition for the third strafe pass) an aileron flight control jam was induced into the simulator. Capt Flemming's reactions after encountering a jam that prevented him from rolling back to the right was to go full left aileron and try to rapidly roll underneath, back to an upright attitude. Capt Flemming attempted to recover from the control jam three times but was unsuccessful. Each time the simulator crashed in an inverted wing down attitude. On the last attempt he was told to position his nose a little higher on his pitch up prior to the turn (this could cause him to gain a little more altitude than planned) and then do the normal over bank (110°–120° left wing down) to move back down to altitude. When at

110° + 120° of bank, he was again given a control jam which maintained left aileron input and consequently left roll. His only option for recovery, according to his testimony, was full left aileron to roll underneath—on this attempt the simulator crashed in an inverted attitude with right wing down 60° and nose low 40°–45°."

The defendant objects to the results of Flemming's simulator "flights" as being untrustworthy because conditions on the simulator were not identical to the real-life conditions experienced by the deceased pilot.

■ Simulators are widely used by the Air Force to recreate flight conditions and this Court finds this paragraph to be relevant under FRE 402. The defendant may avoid undue prejudice by stressing the differences between the simulator and real conditions, especially the fact that because the stick was immovable in the real aircraft, giving the pilot earlier warning of the problem, Walker had more time to take corrective action than did Capt. Flemming in the simulator, thus giving some support to the theory of pilot error. Item 4 is admitted.

### E and F. *Items 5 and 6*

The defendant objects to the contents of page L–1 and to Items 10 and 12 on page N–4 of the report on the grounds that they are not relevant under FRE 402. Page L–1 is a certificate of damage and shows the cost of the downed aircraft, while Items 10 and 12 on page N–4 set forth the replacement value of the aircraft.

■ Plaintiff asserts this information is relevant to the issues of design defect and standard of care, but what plaintiff appears to be saying in its Response to Defendant's Objections is that the defendant spent so much money in developing and building the aircraft that if something went wrong the defendant must be responsible.

The plaintiffs must prove their case. This Court fails to see the relevance of this information at the present time and finds that if admitted, it could be unduly prejudicial to the defendant. The relevance of the cost of the aircraft would be apparent if the Air Force was also suing the defendant here, but that is not the case. These items are not admitted.

### G. *Item 7*

Pages N–6, N–7 and N–8 of the report are objected to by the defendant as being both untrustworthy and unduly prejudicial under FRE 403. These pages comprise the teletype report which Colonel DeVille received from Davis Monthan Air Force Base as a result of the inspection of aircraft for pieces of foam. The summary of this report was discussed earlier under Item 3 of this decision. Item 7 will not be admitted into evidence for the same reasons discussed under Item 3.

### H. *Item 8*

■ The defendant next objects to the photograph which appears at page R–9 of the report on the grounds of untrustworthiness and possible prejudice to the defendant. The plaintiff maintains that this photograph shows a piece of foam taken from the mishap aircraft after impact and depicts the defective nature of the foam adhesive used in that aircraft. Thus, it is highly relevant on the issue of manufacturing defect, the plaintiff charges. It seems that this photograph is relevant to the instant case and therefore admissible. However, the quality of the submitted photocopied photograph is so poor that this Court is unable to determine at this time what is alleged to be foam adhesive and what is not. For that reason, this Court will deny admissibility of page R–9 until a higher quality photograph is submitted to the Court.

### I. *Item 9*

■ The defendant objects to the photographs appearing on pages R–23, R–24 and R–25 of the report on the grounds that a proper foundation has not been laid. This Court agrees with the defendant that the information supplied regarding these foam segments is insufficient. It is unclear from

where in the aircraft the pieces were removed and whether they had broken off or come off because of insufficient gluing. Most importantly, this Court cannot determine for itself what these photographs allegedly depict. The action of the plaintiff in telling this Court that the "relevance of these photographs is far more important when they are seen in color" and then providing the Court with inferior black-and-white photocopier versions which depict various shades of gray blur is not helpful. Pages R–23, R–24 and R–25 shall not be admitted into evidence until the plaintiff provides a proper foundation for them and provides photographs of evidentiary value to this Court.

### J. *Item 10*

The defendant objects to page S–53 of the report on the grounds that it is not relevant under FRE 402 or, if it is relevant, that its prejudicial effect outweighs its probative value under FRE 403. This portion of the report describes a problem Walker had with an aircraft equipped with the Beta-Dot SAS System. The defendant objects because, "Since the SAS system had nothing to do with this accident one way or the other, reference to another problem with the aircraft not connected with the accident is not only not relevant, but is highly prejudicial."

 It is true that S–53 deals with a problem in an aircraft unlike the aircraft which crashed in the instant case. However, its relevance is obvious. Since the defendant's main defense is "pilot error", it is highly relevant that on a prior occasion Walker was able to recover an aircraft at an altitude of approximately 50 feet above the ground. The relevance of this evidence outweighs any prejudicial effect on the defendant. Item 10 is admitted into evidence.

### K. *Item 11*

This document is a copy of the testimony of Capt. Jerome L. Flemming regarding his participation in simulator "flights", and, in particular, regarding the fact that the simulator could not be programed to physically jam the control stick, which allegedly took place in the fatal flight. It includes Flemming's statement that because the stick was not frozen, he may have had less time to react to his situation than Walker would have had with a jammed stick. This is basically the same objection as that contained in Item 4, and this portion of the report will be admitted for the same reasons as expressed under that prior item.

### L. *Item 12*

 This is the defendant's last objection at this time and concerns the second page of section U–8 of the report. The defendant objects to the following question and answer asked of John McPherson, an aerospace engineer who examined the flight controls of the mishap aircraft:

"Q. To your knowledge, is there any material located within or adjacent to the flight control linkage, the bell cranks, etc., the components of the flight control system, that could have caused some kind of restriction?

"A. *Subsequent investigation* has brought to light the fact that the ballistic foam that's in those areas *could indeed cause a restriction or control jam* and, if it were this, there would not be any marks left on the control hardware nor would you probably be able to find a piece of it that may have done the jamming." (Emphasis supplied.)

This Court holds that this investigation does not violate the trustworthiness standards enunciated in *Baker v. Elcona Homes Corp.,* supra, but that this question and answer does violate FRE 403 in that it may be unduly prejudicial to the defendant. The answer is a vague statement which does not satisfy the following questions: What subsequent investigation was conducted and when; what was investigated; who conducted the investigation; and what were the specific results of the investigation? If the defendant had been able to cross-examine the witness on these issues, this Court would admit the question and answer into evidence. However, no cross-examination of this sort was possible since

this was a United States Air Force investigation. Item 12 will not be admitted into evidence.

### V. *Conclusion*

For the above-stated reasons, this Court holds that the United States Air Force report entitled "Investigation of Department of Defense Class A Accident, 10 July 1981, A–10A 75–0302," lodged June 17, 1982, will be admitted into evidence in the instant case, with the following exceptions:

(1) Subparagraph c. of ¶ 13 on pages 6 and 7 of the report;

(2) Page L–1;

(3) Items 10 and 12 on page N–4;

(4) Pages N–6, N–7 and N–8;

(5) Page R–9;

(6) Pages R–23, R–24 and R–25; and

(7) Page 2 of Section U–8.

At trial, the plaintiff may offer to admit pages R–9, R–23, R–24 and R–25 into evidence if it chooses to comply with the Court's suggestions regarding those pages. It is so ordered.