827 F.2d 1498
 56 USLW 2182, 23 Fed. R. Evid. Serv. 833
 John C. RAINEY, Individually and as Personal Representative
of the Estate of Barbara A. Rainey, Plaintiff-Appellant,
v.
BEECH AIRCRAFT CORPORATION, Beech Aerospace Services, Inc.,
and Pratt and Whitney Aircraft of Canada, Ltd.,
Defendants-Appellees.
Rondi M. KNOWLTON, Individually and as Personnel
Representative of the Estate of Donald Bruce
Knowlton, Plaintiff-Appellant,
v.
BEECH AIRCRAFT CORPORATION, Beech Aerospace Services, Inc.,
and Pratt and Whitney Aircraft of Canada, Ltd.,
Defendants-Appellees.
 Nos. 84-3625, 84-3626.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 22, 1987.
 
 Dennis K. Larry, Donald H. Partington, Pensacola, Fla., Edward R. Curtis, Ft. Lauderdale, Fla., for plaintiff-appellant.
 Joseph W. Womack, R. Benjamin Reid, Miami, Fla., Robert P. Gaines, Joe J. Harrell, Pensacola, Fla., for defendants-appellees.
 Appeals from the United States District Court for the Northern District of Florida.
 Before RONEY, Chief Judge, GODBOLD, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HATCHETT, ANDERSON, CLARK, EDMONDSON, Circuit Judges.
 PER CURIAM:
 
 
 1
 This case was taken en banc for the purpose of reconsidering controlling authority in this Circuit concerning the admissibility in evidence of an opinion expressed in an investigative report of an airplane crash. The Court is evenly divided on the issue, however, so that the controlling authority remains as set forth in the panel decision. Since the Court is unanimous in upholding the panel's decision on the other evidentiary issue which requires a reversal for a new trial, the effect of this en banc procedure is to reinstate the panel opinion. Rainey v. Beech Aircraft Corp., 784 F.2d 1523 (11th Cir.1986). This opinion will simply review the case and the effect of this decision.
 
 
 2
 Lieutenant Commander Barbara Ann Rainey, a flight instructor with the United States Navy, and her student, Ensign Donald Bruce Knowlton died on July 13, 1982 in a fiery airplane crash while practicing landings and takeoffs at Middleton Field, Alabama. Their spouses, John Charles Rainey ("Rainey") and Rondi M. Knowlton ("Knowlton") sought money damages under the Florida Wrongful Death Act, Fla.Stat.Ann Sec. 768.16-.27 in district court. The jury returned a verdict against the plaintiffs.
 
 
 3
 At trial, the only disputed issue was the cause of the fatal crash. Lieutenant Colonel David I. Habermacher, Jr., with authorization from the Manual of the Judge Advocate General Sec. 0902, at 9-3 to -5, appointed Lieutenant Commander William C. Morgan, Jr. to conduct an investigation into the circumstances surrounding the aircraft accident. Lieutenant Commander Morgan's report, since it was prepared in conjunction with an authorized Judge Advocate General investigation, is a public record. Because no evidence was introduced to show that the report lacked trustworthiness, the factual findings contained in the report are admissible under Rule 803(8). Rainey, 784 F.2d at 1527. In his report, however, Morgan also gave his opinion that pilot error was "[t]he most probable cause of the accident." Id. at 1526.
 
 
 4
 Rainey and Knowlton disagreed with Lieutenant Commander Morgan's opinion. In a letter written to Morgan about the "aircraft mishap," Rainey, also a flight instructor with the United States Navy, concluded that the mishap was not the result of pilot error but more probably "caused by some form of pneumatic sensing/fuel flow malfunction, probably in the fuel control unit." According to Rainey, this malfunction prompted an inflight "power interruption" or "rollback" making it impossible for Lieutenant Commander Rainey to sustain sufficient power to maintain flight.
 
 
 5
 Because the two people in the plane were killed and the aircraft was almost totally destroyed by fire, the parties relied heavily on opinions developed by expert witnesses. The defendants offered into evidence the opinion contained in the investigative report prepared by Lieutenant Commander Morgan.
 
 
 6
 Two points are raised on appeal. First, plaintiffs contend that John Charles Rainey's testimony was unduly restricted on cross-examination by his own attorney about his letter to Morgan after counsel for Beech Aircraft Corporation had called Rainey as an adverse witness. The panel opinion fully sets forth the circumstances concerning this issue and concludes the district court should be reversed for two reasons: (1) Fed.R.Evid. 106 requires the court to let Rainey testify as to the whole letter and, (2) the testimony was admissible under Fed.R.Evid. 801(d)(1)(B). Rainey, 784 F.2d 1528-30. The Court is unanimous in concluding that the panel opinion is correct in reasoning and result, so no further discussion of the issue is in order here.
 
 
 7
 Second, Rainey and Knowlton appeal the district court's decision to admit into evidence, over their objection, the opinion as to cause of the accident in the investigative report prepared by Lieutenant Commander Morgan. Morgan did not testify at the trial. The panel held that prior precedent of this Court, found in Smith v. Ithaca Corp., 612 F.2d 215 (5th Cir.1980), requires that the district court be reversed on this point. Rainey, 784 F.2d at 1527-28. Smith holds that "evaluative conclusions and opinions," such as those contained in Lieutenant Commander Morgan's report, are not admissible. 612 F.2d at 221-22. The Eleventh Circuit, in Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc ), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981. Judge Johnson specially concurred in the panel opinion, noting that although Smith controlled the panel decision, it should be reconsidered en banc. Rainey, 784 F.2d at 1530.
 
 
 8
 Although this case was taken en banc for the purpose of reconsidering the evidentiary issue decided in Smith, the Court is evenly divided on the point. Judges Roney, Godbold, Hill, Fay, Vance and Clark would all adhere to Smith. Judges Tjoflat, Kravitch, Johnson, Hatchett, Anderson and Edmondson would follow the reasoning suggested in Judge Johnson's concurring opinion and overrule Smith.
 
 
 9
 Since the Court is evenly divided, there is no useful purpose in the publication of opinions setting forth the reasoning of either view. All judges agree that unless Smith is changed by the en banc court, it controls the issue in the district court. Since it takes a majority of the en banc court to change a prior precedent of this Court, Smith controls and the panel opinion properly decides the issue.
 
 
 10
 REVERSED and REMANDED.
 
 
 11
 TJOFLAT, Circuit Judge, specially concurring, in which JOHNSON, Circuit Judge, joins:
 
 
 12
 I concur in the en banc court's judgment in this case, reversing the district court because it improperly restricted the cross-examination of John Charles Rainey. The second issue in this case is whether the evaluative conclusions contained in Lieutenant Commander (LCDR) Morgan's investigative report are admissible under Fed.R.Evid. 803(8)(C).[1] I write separately to urge the court to take its place among the majority of our sister circuits, favoring broad admissibility under Rule 803(8)(C)'s "factual findings" standard. Were we to adopt the majority view, I submit that we would hold that the district court in this case properly admitted the evaluative conclusions contained in the investigative report.
 
 I.
 
 13
 On July 13, 1982, LCDR Barbara Ann Rainey, a flight instructor with the United States Navy, and her student, Ensign (ENS) Donald Bruce Knowlton, died in a fiery airplane crash while practicing "touch and go" landings and takeoffs[2] at Middleton Field in Alabama. The day after the crash, Lieutenant Colonel (LCOL) Habermacher of the United States Marine Corps, the Commanding Officer of LCDR Rainey's training squadron, under authority of the Manual of the Judge Advocate General Sec. 0902, at 9-3 to 9-5, appointed LCDR William C. Morgan, Jr. to investigate the aircraft accident.[3]
 
 
 14
 On September 1, 1982, LCDR Morgan, pursuant to the requirements established by the Judge Advocate General, filed a written report with LCOL Habermacher. Accompanying LCDR Morgan's investigative report were sixty documents, termed "enclosures," consisting of 159 pages. The enclosures included the following documents: summaries of LCDR Rainey's naval flight and medical records and of ENS Knowlton's aviation and medical records; Training Squadron Three's flight schedule for July 13, 1982; history and inspection records, including an outstanding maintenance action form, of the aircraft that crashed; air traffic control records; statements from the other instructors and students who were engaged in the "touch and go" exercise, as well as statements from other witnesses to the crash; crash crew rescue reports; aerial photographs of the crash site; casualty reports; the engineering investigative report on the aircraft's engine; photographs of the plane's wreckage; statements from the spouses of the crash victims; diagram of the Middleton Field traffic pattern; and copies of the autopsy protocol and toxicology reports of LCDR Rainey and ENS Knowlton. Based on the sixty enclosures and on his investigation, LCDR Morgan prepared a six-page summary, including a preliminary statement, findings of fact, opinions, and recommendations. That summary is reproduced here in full:
 
 PRELIMINARY STATEMENT
 
 15
 1. As directed by enclosure (1) and in accordance with reference (a), an informal investigation was conducted into the circumstances surrounding the aircraft accident which occurred Southeast of Middleton Airport near Evergreen, Alabama, on 13 July 1982.
 
 
 16
 2. All reasonably obtainable evidence has been compiled and examined during the course of the investigation and all directives of the convening authority have been met. Certain real evidence collected by the Aircraft Accident Board was also obtained, however, considerable care was taken to ensure a separate and accurate investigation.
 
 
 17
 3. All claims and potential claims for damages by landowners have been investigated. The original claim of Mr. William W. Ward has been hand carried to Naval Legal Service, Pensacola, Florida. No estimates were required with this claim based on a phone conversation with LCDR G.F. Indest of the Naval Legal Service in Pensacola, Florida. The other property owner involved, Mr. Roger Warrick of Gauiter, Mississippi, has been notified of the accident and furnished Standard Form 95 by registered mail.
 
 
 18
 4. Several witnesses were found that heard the radio transmissions and saw the aircraft just prior to the crash. They all seemed rational and observant. Witnesses interviewed were not designated as parties to the investigation and all were advised of the nature of the JAG investigation.
 
 
 19
 5. The unusual length of time required to complete this investigation was due to the delay in receiving the autopsy reports on the two pilots and the delay in receiving the engineering investigation on the engine of aircraft 3E955. Additional delays were due to the research required to validate points brought out in the engineering investigation.
 
 FINDING OF FACT
 
 20
 1. At approximately 1020 local on 13 July 1982, a U.S. Navy T-34C aircraft, bureau number 160955, piloted by LCDR Barbara A. Rainey crashed approximately two miles Southeast of Middleton Airport near Evergreen, Alabama, (enclosure (3)).
 
 
 21
 2. LCDR Barbara A. Rainey, ssm-os-agky USNR, reported to Training Squadron THREE on 16 November 1981, (enclosure (4)). At the time of the accident LCDR Rainey was fully NATOPS qualified (Naval Air Training and Operation Procedures Standardization Program) and Instrument qualified (enclosure (5)) as well as being a qualified familiarization instructor, (enclosure (6)). As of 12 July 1982, LCDR Rainey had accumulated 1331 total flight hours of which 209 were logged in the T-34C aircraft. LCDR Rainey had logged 96.2 hours during the 90 days preceeding [sic] the accident, (enclosure (7)). LCDR Rainey's Aviator's Log Book indicated no record of previous accidents or flight violations, (enclosure (8)).
 
 
 22
 3. ENS Donald B. Knowlton, vio-dl-jrau USNR, was on active duty and checked into Training Squadron THREE on 24 May 1982 for duty as a Student Naval Aviator, (enclosure (9)). He had an average flight grade of 2.94 and had accumulated 4.5 hours in the T-34C aircraft, (enclosure (10)).
 
 
 23
 4. LCDR Rainey was physically qualified for flight duty and was in a flight status on 13 July 1982, (enclosure (11)).
 
 
 24
 5. ENS Knowlton was physically qualified for flight duty and was in a flight status on 13 July 1982, (enclosure (12)).
 
 
 25
 6. LCDR Rainey and ENS Knowlton were scheduled to fly Familiarization Flight Four at 0645 on 13 July 1982 by Training Squadron THREE's flight schedule authorizing the flight, (enclosure (13)).
 
 
 26
 7. Aircraft 160955, a T-34C, was accepted by the Navy on 26 September 1978. Inspection of the aircraft records, history, and logs revealed that all required maintenance inspections and technical directives had been complied with, (enclosure (14)). There was one outstanding discrepancy, the air-conditioning ground blower door spring was broken, (enclosure (15)).
 
 
 27
 8. Aircraft Technical Directive No. T-34C-017 which was designed to provide a manual back-up system for fuel metering, (enclosure (16)), was not installed, (enclosure (14)). Although much has been written about the need for a manual fuel control, (enclosures (17), (18), (19), (20) and (21)), it is still not installed in the T-34C aircraft, (enclosure (14)).
 
 
 28
 9. LCDR Rainey and ENS Knowlton were issued aircraft 160955 and LCDR Rainey signed the acceptance sheet thereby assuming the responsibility of pilot in command, (enclosure (22)).
 
 
 29
 10. Review of North Whiting Tower traffic control strips for 13 July 1982 show that aircraft 160955 (3E955) departed North Whiting Field at 0915 local under VFR conditions, (enclosure (23)).
 
 
 30
 11. The weather observed indicated no conditions that would have a direct effect on the flight, (enclosure (24)). Weather in the Middleton pattern was excellent with no clouds, visibility 5 miles or more, and winds light and from the south, (enclosures (25), (26), (27) and (28)).
 
 
 31
 12. At approximately 1001, 3E955 entered the pattern at Middleton Field for Runway 18. At least four approaches were flown with a minimum of two "touch and go's" completed prior to the accident, (enclosure (28)).
 
 
 32
 13. At approximately 1020, while turning crosswind without proper interval, 3E955 crashed, immediately caught fire and burned, (enclosures (25), (27), (29), (30), (31) and (32)).
 
 
 33
 14. Upon receiving notification of a crash and seeing smoke to the southeast of Middleton Field, the crash crew immediately began transit to the crash site, (enclosures (27), (28) and (29)).
 
 
 34
 15. The [wreckage] of 3E955 crashed into a farmer's field of cutover timber with scattered trees in the area. The area has slightly rolling hills with a small dirt road passing near the crash site, (enclosure (41)).
 
 
 35
 16. 3E955 crashed on property owned by Mr. Roger Warrick. Transit to the crash site required that the crash crew and other vehicles cross property owned by Mr. William W. Ward, (enclosure (42)).
 
 
 36
 17. During transit to the crash site, the crash crew had difficulty in locating the [wreckage] due to the muddy road conditions and the circuitous route required to go around a small stream and follen [sic] trees. Additionally, there were no current, detailed maps of the local area available to the crash crew. 3E467, piloted by LCDR Richard E. Blake, was over the crash site and assumed on scene command and attempted to direct the crash crew to the [wreckage], (enclosures (27), (28), (31) and (33)).
 
 
 37
 18. ABH1 R.S. Scribner stated that at approximately 1022 local, he stopped the crash truck and picked up a civilian who assisted in locating the [wreckage] of 3E955, (enclosure (28)).
 
 
 38
 19. LT Ted J. Choley stated that at approximately 1030 local, he received a call from LT Will Carpenter on base radio stating that there was an accident at Middleton Field, (enclosure (36)).
 
 
 39
 20. At 1035 local, North Whiting Field operations was notified of a possible aircraft accident near Middleton Field, (enclosure (37)).
 
 
 40
 21. Upon arrival at the [wreckage] at 1040 local, the crash crew immediately began efforts to extinguish the fire using AFFF (lite water) and attempted to locate survivors. No response was heard to ABH1 Scribner's call to crewmembers of the aircraft. The burned bodies of both pilots were noted at this time, (enclosures (27), (28), (34) and (35)).
 
 
 41
 22. When all the AFFF (lite water) on the truck was depleted, the crash crew used all of the portable fire extinguishers on the truck in an attempt to put out the fire. When this failed, they resorted to shoveling dirt on the fire in an attempt to smother it, (enclosures (27), (28), (31), (34) and (35)). At 1042 local, all fires were extinguished with the exception of a magnesium fire which the crash crew was unable to put out, (enclosure (38)).
 
 
 42
 23. LCDR Rainey sustained a lethal neck injury at impact but bodily functions continued for an undetermined period, (enclosures (52) and (55)).
 
 
 43
 24. ENS Knowlton was killed instantly due to massive head injuries sustained at impact, (enclosures (52) and (56)).
 
 
 44
 25. At some undetermined point in the crash sequence, the rotary buckle holding the shoulder straps of the from [sic] cockpit harness failed, (enclosure (50)).
 
 
 45
 26. At some point during the flight or the subsequent crash, a LPA (life preserver assembly) inflation lever was moved to the activated position, (enclosure (51)).
 
 
 46
 27. At the time of impact, the engine of 3E955 was operating but was operating at reduced power, (enclosure (48)).
 
 
 47
 28. At 1050 local, HT-18 launched aircraft 171 as a SAR (search and rescue) mission to Middleton Field, (enclosure (39)). The aircraft arrived at the crash site at 1125 local and assumed on scene command from 3E467. 3E467 was relieved from communications relay duties at 1130 local, (enclosure (33)).
 
 
 48
 29. Upon landing at the site, the crew of aircraft 171 was informed that there were no survivors, (enclosures (43), (44) and (45)).
 
 
 49
 30. At 1050 local, HC-16 was notified by phone of an aircraft accident near Middleton Field. At 1105 local, a UH-1N launched and proceeded to the crash site, arriving there at 1150 local. Upon landing, HC-16 was requested to transport the bodies of the victims to NARMC (Naval Aerospace Regional Medical Center). The remains of the pilots were removed from the [wreckage], placed in body bags, and moved to the helicopter. Takeoff from the crash site was at 1430 local, and arrival at NARMC was at 1515 local. The remains were taken from the helicopter and placed in an ambulance for transportation to the hospital, (enclosure (40)).
 
 
 50
 31. An Engineering Investigation was conducted on the engine of aircraft 160955 by the Naval Air Rework Facility, NAS Pensacola, Florida, (enclosure (48)).OPINIONS
 
 
 51
 1. Examination of the findings of fact, aircraft history, and inspection records indicate [sic] no irregularities which can be specified as a cause of the crash of 3E955.
 
 
 52
 2. There is no factual evidence of command or supervisory error.
 
 
 53
 3. There is no factual evidence to indicate that LCDR Rainey or ENS Knowlton were not physically, socialogically [sic], or mentally prepared to complete their flight.
 
 
 54
 4. There is evidence to indicate that the failure of ENS Knowlton's rotary buckle may have contributed to the severity of his head injury.
 
 
 55
 5. Because both pilots were killed in the crash and because of the nearly total destruction of the aircraft by fire, it is almost impossible to determine exactly what happened to Navy 3E955 from the time it left the runway on its last touch and go until it impacted the ground. However, from evidence available and the information gained from eyewitnesses, a possible scenario can be constructed as follows:
 
 
 56
 a. 3E955 entered the Middleton pattern with ENS Knowlton at the controls attempting to make normal landings.
 
 
 57
 b. After two unsuccessful attempts, LCDR Rainey took the aircraft and demonstrated two landings "on the numbers". After getting the aircraft safely airborne from the touch and go, LCDR Rainey transferred control to ENS Knowlton.
 
 
 58
 c. Due to his physical strength, ENS Knowlton did not trim down elevator as the aircraft accelerated toward 100 knots; in fact, due to his inexperience, he may have trimmed incorrectly, putting in more up elevator.
 
 
 59
 d. As ENS Knowlton was climbing to pattern altitude, he did not see the aircraft established on downwind so he began his crosswind turn. Due to ENS Knowlton's large size, LCDR Rainey was unable to see the conflicting traffic.
 
 
 60
 e. Hearing the first call, LCDR Rainey probably cautioned ENS Knowlton to check for traffic. Hearing the second call, she took immediate action and told ENS Knowlton she had the aircraft as she initiated a turn toward an upwind heading.
 
 
 61
 f. As the aircraft was rolling from a climbing left turn to a climbing right turn, ENS Knowlton released the stick letting the up elevator trim take effect causing the nose of the aircraft to pitch abruptly up.
 
 
 62
 g. The large angle of bank used trying to maneuver for aircraft separation coupled with the abrupt pitch up caused the aircraft to stall. As the aircraft stalled and went into a nose low attitude, LCDR Rainey reduced the PCL (power control lever) toward idle. As she was rolling toward wings level, she advanced the PCL to maximum to stop the loss of altitude but due to the 2 to 4 second lag in engine response, the aircraft impacted the ground before power was available.
 
 
 63
 6. Although the above sequence of events is the most likely to have occurred, it does not change the possibility that a "rollback" did occur.
 
 
 64
 7. The most probable cause of the accident was the pilots [sic] failure to maintain proper interval [between LCDR Rainey's aircraft and another aircraft in the pattern].
 
 
 65
 8. There are many items that are considered as possible contributing factors to the accident. They are listed as follows:
 
 
 66
 a. The design of the aircraft which limits forward visability [sic] when in a climb.
 
 
 67
 b. The performance of the engine from idle to max power and the associated lag.
 
 
 68
 c. The relative size of the individuals, ENS Knowlton's size and strength could enable him to overpower LCDR Rainey in a panic situation.
 
 
 69
 d. The possibility that an LPA (life preserver assembly) was inflated at a critical time.
 
 
 70
 e. The inability of early stage students to trim correctly.
 
 
 71
 9. The Middleton Crash Crew and the RDO (Runway Duty Officer) acted in a very professional manner.RECOMMENDATIONS
 
 
 72
 1. That the claim of Mr. William W. Ward be honored.
 
 
 73
 2. That a flight for the NATOPS syllabus be designed to familiarize all pilots with the different type stalls that may be encountered.
 
 
 74
 3. That landing lights be used in the landing pattern to enhance visibility of aircraft established downwind.
 
 
 75
 4. That every effort be made to incorporate Aircraft Technical Directive No. T-34C-0147 at the earliest possible date.
 
 
 76
 /s/ W.C. Morgan, Jr.
 
 
 77
 In letters to the Judge Advocate General of the United States Navy, the following officers endorsed LCDR Morgan's investigative report: the Commanding Officer of Training Squadron Three (LCOL Habermacher), the Commanding Officer of Training Squadron Five, the Chief of Naval Education and Training, and the Chief of Naval Operations. In addition, two other officers sent endorsement letters to LCOL Habermacher. Although a few endorsers took issue with some of LCDR Morgan's recommendations, none disagreed with any of his opinions that were admitted into evidence.
 
 
 78
 Disagreeing with LCDR Morgan's opinion that pilot error was "[t]he most probable cause of the accident," the spouses of the crash victims, John Charles Rainey and Rondi M. Knowlton, filed separate suits on April 15, 1983 in the district court against the manufacturer of the aircraft, Beech Aircraft Corporation, the manufacturer of the aircraft's engine, Pratt & Whitney Canada, Inc., and the Navy's contract maintenance service for the aircraft, Beech Aerospace Services, Inc.[4] Each plaintiff alleged negligence and strict product liability causes of action and sought money damages under the Florida Wrongful Death Act, Fla.Stat. Secs. 768.16-.27 (1985). Specifically, Rainey and Knowlton each alleged that "[t]he aircraft and engine were equipped with a pneumatic fuel control system which was defective in its design and/or manufacture in that it was prone to malfunction in such [a] way as to cause 'power interruptions' ... such that the pilot of the subject aircraft was unable to sustain sufficient power to maintain flight." The spouses alleged that Beech Aircraft and Pratt & Whitney were negligent in designing and manufacturing the aircraft and engine in that they knew or should have known of the defects; they alleged that Beech Aerospace Services, Inc. was negligent when it issued to LCDR Rainey an aircraft that it knew or should have known had a defective fuel control system. Both Rainey and Knowlton sought punitive damages against the defendants, contending that they acted "in reckless disregard for the safety of decedent and other persons who they knew would fly the aircraft." At a pretrial conference on March 20, 1984, the district court granted Beech Aircraft's motion to consolidate the two cases for all purposes, including trial.
 
 
 79
 During that same pretrial conference, the district court held that LCDR Morgan's investigative report was trustworthy and that his factual findings, but not his opinions or conclusions, would be admissible. On July 10, 1984, during a hearing held the day before trial, the district court reversed in part its prior ruling on the admissibility of LCDR Morgan's report. The court reiterated that "the defendants [could] place in evidence before the Jury the findings of facts, 31 in number, that were in the JAG report." The court further held "that the opinions attached to those 31 findings may also be admitted, to the extent that they are opinions and conclusions." According to the district court, however, not every "opinion" in LCDR Morgan's report was admissible under Fed.R.Evid. 803(8)(C):
 
 
 80
 Paragraph five is nothing but a possible scenario, as it's called, and would not be allowed in. Paragraph eight talks about possible contributing factors and it would not be allowed in. Paragraph nine, which says somebody acted in a very professional manner, would not be allowed in because it is not relevant.
 
 
 81
 Accordingly, the district court held that paragraphs five, eight, and nine of the report's "opinions" section would not be allowed into evidence at trial.[5]
 
 
 82
 The plaintiffs objected to the district court's new ruling on the admissibility of the JAG report, citing Smith v. Ithaca Corp., 612 F.2d 215 (5th Cir.1980).[6] In light of the court's ruling, the plaintiffs requested an opportunity to review the JAG report for the purpose of offering evidence and witnesses relating to LCDR Morgan's "Opinion" No. 7 (which appears to be based on "Finding of Fact" No. 13): "The most probable cause of the accident was the pilots [sic] failure to maintain proper interval." The district court granted the plaintiffs' request.
 
 
 83
 The only disputed issue at trial was the cause of the fatal crash. The parties relied heavily on opinions of expert witnesses. The defendants relied in part on excerpts from the opinions contained in LCDR Morgan's investigative report.[7] The following "opinions" from that report were admitted into evidence:
 
 
 84
 1. Examination of the findings of fact, aircraft history, and inspection records indicate [sic] no irregularities which can be specified as a cause of the crash of 3E955.
 
 
 85
 2. There is no factual evidence of command or supervisory error.
 
 
 86
 3. There is no factual evidence to indicate that LCDR Rainey or ENS Knowlton were not physically, socialogically [sic], or mentally prepared to complete their flight.
 
 
 87
 4. There is evidence to indicate that the failure of ENS Knowlton's rotary buckle may have contributed to the severity of his head injury.
 
 
 88
 ....
 
 
 89
 7. The most probable cause of the accident was the pilots [sic] failure to maintain proper interval.
 
 
 90
 On July 20, 1984, the jury returned a verdict for the defendants, finding that the deaths of LCDR Rainey and ENS Knowlton were not legally caused by the aircraft's fuel control system, and that there was no negligence on the part of Beech Aircraft, Pratt & Whitney, or Beech Aerospace that legally caused the deaths of LCDR Rainey and ENS Knowlton.
 
 
 91
 On August 1, 1984, the plaintiffs filed a motion for a new trial, challenging two of the trial judge's evidentiary rulings. The district court denied the motion, and this appeal followed.
 
 
 92
 A panel of this court reversed the district court, holding that the district court improperly restricted plaintiff Rainey's trial testimony and that it improperly admitted into evidence, contrary to precedent of this court found in Smith v. Ithaca Corp., 612 F.2d 215 (5th Cir.1980), the opinions contained in LCDR Morgan's investigative report. We took the case en banc to consider both evidentiary issues, thereby vacating the panel's opinion and judgment by operation of law. See 11th Cir.R. 26(k). I write now to urge that the en banc court reject the holding of Smith and affirm the district court's ruling admitting into evidence the opinions contained in LCDR Morgan's investigative report.
 
 II.
 
 93
 To be admissible, an investigative report of the sort prepared by LCDR Morgan must satisfy the hearsay exception for public records and reports found in Fed.R.Evid. 803(8)(C). That rule provides a hearsay exception for "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... in civil actions and proceedings ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." Fed.R.Evid. 803(8)(C). As to the rule's public record requirement, the en banc court holds that LCDR Morgan's investigative report is a public record: it was prepared in conjunction with an authorized Judge Advocate General investigation.
 
 
 94
 As to the rule's caveat that certain findings of a public record are admissible unless the sources of the information that lead to the findings or other circumstances indicate that such sources were untrustworthy, there is no evidence in the record that would indicate that the sources upon which LCDR Morgan relied lacked trustworthiness. The burden was on the plaintiffs to show that the report was inadmissible if they believed that its sources of information or other circumstances indicated that the report lacked trustworthiness. See Fed.R.Evid. 803(8) advisory committee's note (Rule 803(8) "assumes admissibility in the first instance but with ample provision for escape if sufficient negative factors are present"); see also Melville v. American Home Assurance Co., 584 F.2d 1306, 1316 (3d Cir.1978) (citing Muncie Aviation Corp. v. Party Doll Fleet, Inc., 519 F.2d 1178 (5th Cir.1975)). Although the plaintiffs knew months before trial that the defendants would seek to admit LCDR Morgan's investigative report into evidence, they attacked neither the qualifications of LCDR Morgan nor the methodology he employed. During the July 10, 1984 pretrial conference, the plaintiffs requested leave to review the report to determine whether to present evidence bearing on the trustworthiness of the report's opinions. The district court granted the plaintiffs' request, but they presented no evidence challenging the report's trustworthiness and did not seek a continuance to gather such evidence. The plaintiffs have not met their burden. For these reasons, this court cannot, and does not, set aside the district court's finding that the report is trustworthy.
 
 
 95
 The issue that divides us is whether "factual findings resulting from an investigation," Fed.R.Evid. 803(8)(C), encompasses evaluative conclusions derived from the report. The panel that heard this appeal answered in the negative, concluding that it was bound by the former Fifth Circuit's interpretation of "factual findings" in Smith v. Ithaca Corp., 612 F.2d 215 (5th Cir.1980). Rainey v. Beech Aircraft Corp., 784 F.2d 1523, 1527-28 (11th Cir.1986) (per curiam). In a separate concurring opinion, Judge Johnson described Smith as "an anomaly among the circuits" and urged the en banc court to reject the Smith court's reasoning and to adopt a rule favoring broad admissibility of evaluative conclusions contained in investigative reports that are trustworthy public records and are relevant to the issues in question. See id. at 1530 (Johnson, J., concurring specially). I agree with Judge Johnson.
 
 III.
 
 96
 In Smith v. Ithaca Corp., 612 F.2d 215 (5th Cir.1980), the former Fifth Circuit considered the admissibility under Fed.R.Evid. 803(8)(C) of excerpts from a Coast Guard Marine Board of Investigation Report. Acknowledging that the legislative history of the rule does not unambiguously resolve the issue and that the federal courts have disagreed over the appropriate interpretation of "factual findings," the Smith court reached this conclusion:
 
 
 97
 [T]he language of Rule 803 suggests that "factual findings" defines something other than "opinions" and "diagnoses" which are admissible under Rule 803(6) when contained in the records of "a regularly conducted business activity." Rule 803(8), although similar to Rule 803(6), substitutes the term "factual findings" for "opinions" and "diagnoses." Since these terms are used in similar context within the same Rule, it is logical to assume that Congress intended that the terms have different and distinct meanings.
 
 
 98
 Id. at 221-22 (citing Complaint of Am. Export Lines, Inc., 73 F.R.D. 454, 457 (S.D.N.Y.1977)).[8] Accordingly, the Smith court held that "evaluative conclusions and opinions of the Coast Guard Marine Board of Investigation contained in the report should not have been admitted into evidence." Id. at 222. In my view, the Smith court misinterpreted "factual findings" within the meaning of Rule 803(8)(C), unduly limiting the rule's scope.
 
 A.
 
 99
 A literal reading of Rule 803(8)(C) hardly lends itself to a restrictive interpretation. The rule creates a hearsay exception for trustworthy public reports "setting forth ... factual findings resulting from an investigation." Fairly read, the rule admits not merely "factual findings," but reports in their entirety, as long as the reports are trustworthy and contain factual findings. After all, this hearsay exception is entitled "public records and reports," not "factual findings set forth in public records." See Zenith Radio Corp. v. Matsushita Elec. Indus. Co., 505 F.Supp. 1125, 1143 (E.D.Pa.1980) ("The language of 803(8)(C) literally provides for the admission of entire agency reports so long as those reports include, inter alia, factual findings...."), aff'd in relevant part, 723 F.2d 238 (3d Cir.1983), rev'd on other grounds, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
 
 
 100
 The Advisory Committee Notes support this reading of the rule. The Committee couched its discussion in terms of the admissibility of evaluative reports.[9] Although the Committee understood that the rule "assumes admissibility in the first instance," it believed that the rule provides "ample provision for escape if sufficient negative factors are present." Fed.R.Evid. 803 advisory committee's note. The Committee offered a nonexclusive list of "[f]actors which may be of assistance in passing upon the admissibility of evaluative reports":
 
 
 101
 (1) the timeliness of the investigation, McCormick, Can the Courts Make Wider Use of Reports of Official Investigations? 42 Iowa L.Rev. 363 (1957); (2) the special skill or experience of the official, id., (3) whether a hearing was held and the level at which conducted, Franklin v. Skelly Oil Co., 141 F.2d 568 (10th Cir.1944); (4) possible motivation problems suggested by Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943).
 
 
 102
 Fed.R.Evid. 803 advisory committee's note. Notably, the Committee did not even mention the possibility that admissibility would be limited to those portions of evaluative reports that present "factual findings."
 
 
 103
 The House Judiciary Committee "approved Rule 803(8) without substantive change from the form in which it was submitted by the [Supreme] Court." Report of the Committee on the Judiciary, H.R.Rep. No. 650, 93d Cong., 1st Sess. 14 (1973), reprinted in 1974 U.S.Code Cong. & Admin.News 7075, 7088. The Committee, however, adopted a somewhat tortured reading of the public records hearsay exception: "The Committee intends that the phrase 'factual findings' be strictly construed and that evaluations or opinions contained in public reports shall not be admissible under this Rule." Id. That reading is tortured not only because it erroneously focuses on the admissibility of factual findings contained in public reports, rather than on, as the Rule says, public records "setting forth ... factual findings resulting from an investigation," but also because it contorted the meaning of "factual findings."
 
 
 104
 A "finding" is "[a] decision upon a question of fact reached as the result of a judicial examination or investigation by a court, jury, referee, coroner, etc." Black's Law Dictionary 569 (5th ed.1979). That is, a finding "commonly applies to the result reached by a judge or jury." Id. In other words, a "finding" or a "finding of fact" refers to the result or conclusion drawn by an investigator, whether it be a fire inspector, judge, or jury, "from facts without exercise of legal judgment." Id. The common meaning of finding therefore comports with investigative conclusions (i.e., results derived from the examination of facts), but not with idle speculation or legal conclusions: "a finding does not include legal conclusions that may have been reached by an investigator and is necessarily something more than a mere recitation of evidence, although we think the term is broad enough to encompass any statement of fact that represents a conclusion on the part of an investigator." Zenith Radio Corp., 505 F.Supp. at 1144 (footnote omitted). Thus, by way of example, the following investigative (or evaluative) conclusions are "factual findings": whether a traffic light was green or red (there were no eyewitnesses) moments before an automobile accident, see Baker v. Elcona Homes Corp., 588 F.2d 551, 554-59 (6th Cir.1978), cert. denied, 441 U.S. 933, 99 S.Ct. 2054, 60 L.Ed.2d 661 (1979); whether a public school board had established and maintained an elementary school as a black school for segregative purposes, see United States v. School Dist. of Ferndale, 577 F.2d 1339, 1354-55 (6th Cir.1978); whether a state trooper who fatally shot a man who attacked him acted within the guidelines of the department's Policies and Procedures Manual, see Perrin v. Anderson, 784 F.2d 1040, 1046-47 (10th Cir.1986); whether a state trooper acted contrary to department training when he attempted to handcuff a person while holding a cocked weapon, see Wilson v. Beebe, 770 F.2d 578, 589-90 (6th Cir.1985) (en banc); whether a crewmember of a ship started a fight, see Lloyd v. American Export Lines, Inc., 580 F.2d 1179, 1182-83 (3d Cir.), cert. denied, 439 U.S. 969, 99 S.Ct. 461, 58 L.Ed.2d 428 (1978); whether the captain of a tow boat acted reasonably in mooring the vessel and setting the watch, see In re Paducah Towing Co., 692 F.2d 412, 419-21 (6th Cir.1982); whether there is a statistically significant link between tampon use and toxic shock syndrome, see Ellis v. International Playtex, Inc., 745 F.2d 292, 299-304 (4th Cir.1984); and whether a phone company's tariffs were unreasonable and discriminatory, see Litton Systems, Inc. v. AT & T, 700 F.2d 785, 819 (2d Cir.1983), cert. denied, 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984).
 
 
 105
 The Senate Judiciary Committee rejected the House Committee's narrow interpretation of "factual findings," opting instead for the Advisory Committee's view:
 
 
 106
 The House Judiciary Committee report contained a statement of intent that "the phrase 'factual findings' in subdivision (c) be strictly construed and that evaluations or opinions contained in public reports shall not be admissible under this rule." The committee takes strong exception to this limiting understanding of the application of the rule. We do not think it reflects an understanding of the intended operation of the rule as explained in the Advisory Committee notes to this subsection. The Advisory Committee notes on subsection (c) of this subdivision point out that various kinds of evaluative reports are now admissible under Federal statutes. 7 U.S.C. Sec. 78, findings of Secretary of Agriculture prima facie evidence of true grade of grain; 42 U.S.C. Sec. 269(b), bill of health by appropriate official prima facie evidence of vessel's sanitary history and condition and compliance with regulations. These statutory exceptions to the hearsay rule are preserved. Rule 802. The willingness of Congress to recognize these and other such evaluative reports provides a helpful guide in determining the kind of reports which are intended to be admissible under this rule. We think the restrictive interpretation of the House overlooks the fact that while the Advisory Committee assumes admissibility in the first instance of evaluative reports, they are not admissible if, as the rule states, "the sources of information or other circumstances indicate lack of trustworthiness."
 
 
 107
 ....
 
 
 108
 The committee concludes that the language of the rule together with the explanation provided by the Advisory Committee furnish[es] sufficient guidance on the admissibility of evaluative reports.
 
 
 109
 Report of the Committee on the Judiciary, S.Rep. No. 1277, 93d Cong., 2d Sess. 18, reprinted in 1974 U.S. Code Cong. & Admin.News 7051, 7064-65.[10]
 
 
 110
 The Conference Committee did not resolve the differing views of the term "factual findings." The Conference Committee Notes make no reference to the scope of Rule 803(8) or to the meaning of "factual findings." See Notes of Conference Committee, H.R. Conf.Rep. No. 1597, 93d Cong., 2d Sess., reprinted in 1974 U.S. Code Cong. & Admin.News 7098; see also Baker v. Elcona Homes Corp., 588 F.2d 551, 557 (6th Cir.1978), cert. denied, 441 U.S. 933, 99 S.Ct. 2054, 60 L.Ed.2d 661 (1979).
 
 
 111
 The legislative history as to the admissibility of evaluative conclusions is indeed equivocal. Nevertheless, the Senate's view is more consistent with the other hearsay exceptions and with the general spirit of the Federal Rules of Evidence, and is more easily justified on policy grounds. See United States v. AT & T, 498 F.Supp. 353, 359 (D.D.C.1980) ("Extrinsic materials indicate that the Rule is most appropriately considered by following the Senate Committee's position.").
 
 
 112
 Rule 803(6), the regular entries rule, creates a hearsay exception for reports or records "of acts, events, conditions, opinions, or diagnoses ... if kept in the course of a regularly conducted business activity ... unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Fed.R.Evid. 803(6). Because Rule 803(6) uses the terms "opinions" and "diagnoses," whereas Rule 803(8)(C) uses the term "factual findings," the Smith court inferred that Congress must have intended that those terms have distinct meanings and, more specifically, that "factual findings" not encompass evaluative conclusions. See Smith v. Ithaca Corp., 612 F.2d 215, 221-22 (5th Cir.1980). The Smith court reached this erroneous result, I believe, because it apparently gave no credence to the Advisory Committee's Note on Rule 803(6).
 
 
 113
 Tracing the origins of the regular entries rule, the Advisory Committee noted that "[e]ntries in the form of opinions were not encountered in traditional business records in view of the purely factual nature of the items recorded, but they are now commonly encountered with respect to medical diagnoses, prognoses, and test results." Fed.R.Evid. 803 advisory committee's note. The Committee acknowledged, however, that the Commonwealth Fund Act, 28 U.S.C. Sec. 1732, the Uniform Business Records as Evidence Act, Model Code Rule 514, and Uniform Rule 63(13) contained limiting and ambiguous language with respect to diagnoses, test results, and opinions. Thus, according to the Advisory Committee, "[i]n order to make clear its adherence to the [trend toward freely admitting diagnostic entries,] the rule specifically includes both diagnoses and opinions, in addition to acts, events, and conditions, as proper subjects of admissible entries." Fed.R.Evid. 803 advisory committee's note.[11]
 
 
 114
 Given this account of why the regular entries rule makes explicit reference to diagnoses and opinions, it strikes me as absurd to cite the language of that rule as support for an argument limiting the scope of "factual findings" within the meaning of the public records rule. The reason that the regular entries rule specifically mentions "diagnoses" and "opinions" has nothing whatsoever to do with why Rule 803(8) employs the term "factual findings." If anything, attributing a severely restricted significance to the phrase "factual findings" would be inconsistent with the regular entries rule: "No legislative history points to any intent on the part of Congress to limit the public records exception [Rule 803(8) ] so as to exclude records which had previously qualified for admission pursuant to the business entries exception [Rule 803(6) ]." 4 J. Weinstein & M. Berger, Weinstein's Evidence p 803(8) (1985) (citation omitted).
 
 
 115
 In addition, "[b]road admissibility [under Rule 803(8)(C) ] releases trial judges from the duty to draw sometimes arbitrary lines between fact and opinion, and focuses the court's inquiry instead on the trustworthiness and relevance of the reports in question." Rainey v. Beech Aircraft Corp., 784 F.2d 1523, 1530 (11th Cir.1986) (Johnson, J., concurring specially); see also Fed.R.Evid. 704(a) ("[T]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier-of-fact."). Thus, consistent with the basic approach that opinions should be admitted when helpful to the trier of fact, see Fed.R.Evid. 704 advisory committee's note, trustworthy and relevant evaluative opinions should be admitted under the public records exception of Rule 803(8)(C), as long as jurors can ascertain the significant facts that form the basis of the opinion. See 4 J. Weinstein & M. Berger, supra, p 803(8) .
 
 B.
 
 116
 Broad admissibility of public records containing evaluative conclusions (i.e., normative judgments drawn from the analysis of facts) is good policy because these reports are presumptively reliable. Rule 803(8)(C) is premised on "the assumption that a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record." Fed.R.Evid. 803 advisory committee's note (citing Wong Wing Foo v. McGrath, 196 F.2d 120 (9th Cir.1952)). Admission of public records can be justified "by the probability that the officials conducting the investigation (who themselves are under a public duty) will be careful and discriminating in selecting the factual data upon which to rely in reaching their findings and conclusions." G. Lilly, An Introduction to the Law of Evidence 245 (1978). Most investigators under a public duty lack a motive to distort the facts or their conclusions. See, e.g., Ellis v. International Playtex, Inc., 745 F.2d 292, 300 (4th Cir.1984); Kehm v. Procter & Gamble Mfg., 724 F.2d 613, 618-19 (8th Cir.1983); see also Melville v. American Home Assurance Co., 443 F.Supp. 1064, 1112 (E.D.Pa.1977), ("[P]ublic records or reports, by virtue of their being based on legal duty and authority, contain sufficient circumstantial guarantees of trustworthiness to justify their use at trial."), rev'd on other grounds, 584 F.2d 1306 (3d Cir.1978).
 
 
 117
 Dean McCormick offered several other reasons for allowing a trier of fact to receive an investigative report--including the investigator's conclusions based on the facts he has gathered--as evidence:
 
 
 118
 The most important reason is time. The officer comes on the scene usually as early as it is feasible to get there. Usually the investigators of the parties come later and the statements are frequently partial and one-sided. The witnesses at the trial have often only a dim recollection of the event, and their testimony rests mostly on their pre-trial refreshment of memory by these statements. The officer is often able to interview witnesses before they have been pulled one way or the other by the parties. The officer, too, is frequently a specialist--a doctor reporting death, a fire marshall investigating a fire--or at least experienced in like investigations, such as a highway patrolman reporting on a collision.
 
 
 119
 McCormick, Can the Courts Make Wider Use of Reports of Official Investigations?, 42 Iowa L.Rev. 363 (1957). Because the source of these public reports--an investigator operating under authority of law--is presumptively reliable, "there is no reason not to admit the findings simply because they tend towards the conclusory rather than the factual end." United States v. AT & T, 498 F.Supp. 353, 360 (D.D.C.1980); see also Zenith Radio Corp. v. Matsushita Elec. Indus. Co., 505 F.Supp. 1125, 1144 (E.D.Pa.1980) ("[F]actual statements need not be formally termed 'findings' in order to come in under 803(8)(C)."), aff'd in relevant part, 723 F.2d 238 (3d Cir.1983), rev'd on other grounds, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 583 (1986).
 
 
 120
 The presumption that evaluative reports of this sort are trustworthy is, of course, rebuttable. Not every public report made pursuant to an investigation authorized by law that contains factual findings will be admissible. Rule 803(8)(C) allows for the admission of evaluative reports "unless the sources of information or other circumstances indicate lack of trustworthiness." Fed.R.Evid. 803(8)(C). In other words, "if sufficient negative factors are present" to indicate that the report is not trustworthy, then it should not be admitted. Fed.R.Evid. 803(8) advisory committee's note. "The factors that may be used to determine admissibility include: (1) the timeliness of the investigation; (2) the special skill or experience of the official; and (3) possible motivation problems." Ellis v. International Playtex, Inc., 745 F.2d 292, 300-01 (4th Cir.1984) (citing Fed.R.Evid. 803(8)(C) advisory committee's note); see also Perrin v. Anderson, 784 F.2d 1040, 1047 (10th Cir.1986). The court's consideration of such negative factors provides an exclusionary mechanism sufficient to safeguard against the admission of unreliable evidence. Melville v. American Home Assurance Co., 584 F.2d 1306, 1316 (3d Cir.1978).
 
 
 121
 The burden to demonstrate that an investigative report is not reliable is on the party opposing admission of the report. Ellis, 745 F.2d at 301 (citing Kehm v. Procter & Gamble Mfg., 724 F.2d 613, 618 (8th Cir.1983); Baker v. Elcona Homes Corp., 588 F.2d 551, 558 (6th Cir.1978), cert. denied, 441 U.S. 933, 99 S.Ct. 2054, 60 L.Ed.2d 661 (1979)). As a practical matter, this makes a good deal of sense:
 
 
 122
 Most government sponsored investigations employ well accepted methodological means of gathering and analyzing data. It is unfair to put the party seeking admission to the test of "re-inventing the wheel" each time a report is offered. Rather than requiring the moving party to spend considerable time and money to ensure that the experts who conducted the study are available at trial, it is far more equitable to place that burden on the party seeking to demonstrate why a time tested and carefully considered presumption is not appropriate.
 
 
 123
 Ellis, 745 F.2d at 301.
 
 C.
 
 124
 Rule 803(8) must be viewed in conjunction with the other rules of evidence. Accordingly, the admissibility of Rule 803(8)(C) public records of an evaluative nature, which in most cases are prepared by experts, should be interpreted broadly so that Rule 803(8)(C) is consistent with Rule 703, which provides that facts forming the basis of an expert's opinion need not themselves be admissible as long as they are "of a type reasonably relied upon by experts in the particular field." Fed.R.Evid. 703;[12] see also Zenith Radio Corp. v. Matsushita Elec. Indus. Co., 505 F.Supp. 1125, 1148 (E.D.Pa.1980), aff'd in relevant part, 723 F.2d 238 (3d Cir.1983), rev'd on other grounds, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Furthermore, although public records are excepted from the hearsay evidence rule because they are presumed generally to be reliable, the reliability of a particular evaluative report can be tested not only with the trustworthiness inquiry called for by Rule 803(8)(C), but also with the objections permitted by Rules 702 and 705. See Melville v. American Home Assurance Co., 584 F.2d 1306, 1316 (3d Cir.1978). Rule 702 allows objections to the qualifications of an expert witness,[13] and Rule 705 allows disclosure on cross-examination of facts and data underlying an expert's testimony.[14] Of course, an evaluative report admissible under Rule 803(8) may have to be excised in part under Rules 401 and 402, providing that irrelevant evidence is inadmissible,[15] and under rule 403, excluding relevant evidence on grounds of prejudice, confusion, or waste of time.[16]
 
 
 125
 In sum, "Rule 803(8) should be interpreted in accord with th[e] treatment of 'opinion' evidence. If the report states a conclusion that would be helpful--and is reliable--it should be admitted." 4 J. Weinstein & M. Berger, Weinstein's Evidence p 803(8) (1985) (footnote omitted). This determination is a matter to be left within the sound discretion of the district court. The court would thus be "free to say, pursuant to Rule 803(8)(C), 'In this particular case and in view of the shaky foundation for the conclusions, I will exclude the report unless you produce the reporting officer.' " Id. (quoting McCormick, Can the Courts Make Wider Use of Reports of Official Investigations? 42 Iowa L.Rev. 363, 369 (1957)). Another way the trial court can safeguard the rights of the party against whose interest the report is being introduced is to comment on the weight of the evidence, id., and to issue an instruction cautioning the jurors against substituting the investigator's judgment for their own, id.; see also In re Plywood Antitrust Litig., 655 F.2d 627, 637 (5th Cir. Unit A Sept.1981), cert. dismissed, 462 U.S. 1125, 103 S.Ct. 3100, 77 L.Ed.2d 1358 (1983); Cohen v. General Motors Corp., 534 F.Supp. 509, 512 n. 3 (W.D.Mo.1982).
 
 D.
 
 126
 Finally, I note that the weight of authority is against the reasoning of Smith v. Ithaca Corp., 612 F.2d 215 (5th Cir.1980). In 1976, the Supreme Court noted that "[p]rior administrative findings made with respect to an employment discrimination claim may, of course, be admitted as evidence at a federal-sector trial de novo. See Fed.Rule Evid. 803(8)(C)." Chandler v. Roudebush, 425 U.S. 840, 863 n. 39, 96 S.Ct. 1949, 1961 n. 39, 48 L.Ed.2d 416 (1976) (citation omitted). The Smith court made no reference to the Supreme Court's broad reading of Rule 803(8)(C). See Cohen v. General Motors Corp., 534 F.Supp. 509, 512 (W.D.Mo.1982) ("[I]t appears that the Supreme Court has given a broad directive for liberal use of agency findings, somewhat at variance with Judge Wisdom's cautious approach in [Smith ].").
 
 
 127
 As Judge Johnson has noted, "Smith is an anomaly among the circuits. The majority view favors broad admissibility under Rule 803(8)(C)'s 'factual findings' standard. See, e.g., Ellis v. International Playtex, Inc., 745 F.2d 292, 300-01 (4th Cir.1984) ('[I]t is well established that the phrase should be interpreted broadly')." Rainey v. Beech Aircraft Corp., 784 F.2d 1523, 1530 (11th Cir.1986) (Johnson, J., concurring specially); see also Perrin v. Anderson, 784 F.2d 1040, 1046-47 (10th Cir.1986); Kehm v. Procter & Gamble Mfg., 724 F.2d 613, 618-19 (8th Cir.1983); Litton Systems, Inc. v. AT & T, 700 F.2d 785, 819 (2d Cir.1983), cert. denied, 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984); Baker v. Elcona Homes Corp., 588 F.2d 551, 554-59 (6th Cir.1978), cert. denied, 441 U.S. 933, 99 S.Ct. 2054, 60 L.Ed.2d 661 (1979); Melville v. American Home Assurance Co., 584 F.2d 1306, 1316 (3d Cir.1978). Even in the Fifth Circuit, Smith has not been uniformly followed. See, e.g., Mac Towing Inc. v. American Commercial Lines, 670 F.2d 543, 547 (5th Cir.1982) (district court properly admitted Coast Guard accident report that attributed blame in shipping case); Local Union No. 59, Int'l Bhd. of Elec. Workers v. Namco Elec., Inc., 653 F.2d 143, 145 (5th Cir. Unit A Aug. 1981) (findings in NLRB investigative letter admissible under Rule 803(8)(C)); Garcia v. Gloor, 618 F.2d 264, 272 (5th Cir.1980) ("The district judge was, indeed, in error in refusing to admit the investigative report and determination of the EEOC."), cert. denied, 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981). Additionally, courts that have considered the admissibility of JAG reports, similar to the one prepared by LCDR Morgan, under Rule 803(8)(C) have broadly interpreted "factual findings." See, e.g., Walker v. Fairchild Indus., 554 F.Supp. 650, 653 (D.Nev.1982); Sage v. Rockwell Int'l Corp., 477 F.Supp. 1205, 1207-10 (D.N.H.1979); Schoenborn v. Boeing Co., 586 F.Supp. 711, 725, 18 Av. Cas. (CCH) 18,335, 18,344-45 (E.D.Pa.1984).
 
 IV.
 
 128
 A majority of this court agrees that LCDR Morgan's investigative report is a public record and that it is trustworthy for purposes of Rule 803(8)(C). The report is certainly of the sort that the rule contemplates as trustworthy: the report is thorough, as evidenced by the supporting documents totaling 159 pages, and LCDR Morgan's conclusions are credible, having been endorsed by six fellow officers of various ranks. Moreover, the district court gave the plaintiffs ample opportunity to challenge the trustworthiness of the report; nevertheless, the plaintiffs presented no evidence attacking the qualifications of LCDR Morgan or the methodology he employed.
 
 
 129
 The sole issue that evenly divides this court is whether "factual findings resulting from an investigation," Fed.R.Evid. 803(8)(C), encompasses evaluative conclusions derived from the report. Based on the facts uncovered by his extensive investigation, LCDR Morgan reached several conclusions that the district court admitted into evidence. Finding that the "aircraft history, and inspection records indicate no irregularities which can be specified as a cause of the crash" (Opinion No. 1), LCDR Morgan eliminated, in effect, a defect in the fuel control system as the cause of the accident. He concluded that based on his investigation there was no contributing command or supervisory error (Opinion No. 2). LCDR Morgan also found that neither LCDR Rainey nor ENS Knowlton had any physical or mental ailments that could have caused the crash (Opinion No. 3). Having eliminated several other possible causes of the crash, and based on (1) the statements of the other instructors and students engaged in the "touch and go" exercise, (2) air traffic control records, and (3) an analysis of the traffic pattern diagram for Middleton Field, LCDR Morgan concluded that "[t]he most probable cause of the accident was the pilots [sic] failure to maintain proper interval." (Opinion No. 7). In other words, in LCDR Morgan's professional judgment, pilot error caused the crash.
 
 
 130
 In my view, LCDR Morgan's conclusions that were admitted into evidence at trial are "factual findings" within the common sense meaning of that term and as contemplated by the Advisory Committee and the Senate Judiciary Committee. Moreover, consistent with the overall spirit of the Federal Rules of Evidence, LCDR Morgan's evaluative findings could certainly have been helpful to the jury.
 
 
 131
 For these reasons, the district court did not abuse its discretion when it admitted portions of LCDR Morgan's "opinions." I would nevertheless reverse the district court, concurring in the en banc court's judgment that the district court improperly restricted the cross-examination testimony of John Charles Rainey.
 
 
 
 [1]
 Fed.R.Evid. 803(8)(C) provides as follows:
 Rule 803. Hearsay Exceptions; Availability of Declarant Immaterial
 The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
 ....
 (8) Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.
 
 
 [2]
 A "touch and go" pattern is a training exercise in which, after takeoff, the student circles the airfield in an oval pattern and then lands the aircraft; after landing, the student does not stop the plane but instead accelerates and takes off again
 
 
 [3]
 The letter appointing LCDR Morgan to investigate the crash reads, in full, as follows:
 From: Commanding Officer, Training Squadron THREE
 To: LCDR William C. MORGAN, Jr., USN, 1310
 Subj: Investigation to Inquire into the Circumstances Connected with the Aircraft Accident which occurred at approximately 1020, 13 July 1982, approximately two miles southeast of Middleton Airport in Evergreen, Alabama.
 Ref: (a) JAG Manual Chapter VI and Section 0902, Chapter IX
 
 
 [1]
 You are appointed to conduct an informal investigation in accordance with reference (a), as soon hereafter as practicable, for the purpose of inquiring into all circumstances surrounding the aforementioned accident
 
 
 [2]
 You will conduct a thorough investigation into all the circumstances surronding [sic] the accident and report your findings of fact, opinions and recommendations as to the following:
 a. The cause of the accident.
 b. The possibility of administrative or disciplinary action.
 c. Any claims for or against the U.S. Navy resulting therefrom.
 d. Be advised that no statement taken by you need be subscribed under oath.
 
 
 [3]
 By copy of this appointing letter, the squadron Administrative Department is directed to furnish you assistance in preparing the report of your investigation
 
 
 [4]
 This report will be completed no later than 13 August 1982. If additional time is required, you will submit in writing to the Commanding Officer the reasons for and the amount of additional time required
 /s/ D.I. HABERMACHER, JR.
 On August 12, 1982, LCDR Morgan "requested that the due date for the informal investigation directed by reference (a) be extended for 14 days subsequent to the receipt of the autopsy protocol and toxicology reports and the results of the engineering investigation." On August 13, 1982, LCOL Habermacher approved LCDR Morgan's request.
 
 
 [4]
 Rainey brought suit individually, as the personal representative of his wife's estate, and on behalf of his minor children, Cynthia Ann Rainey and Katharine Marie Rainey. Knowlton brought suit individually, as the personal representative of her husband's estate, and on behalf of her minor children, Ramsey Nia Knowlton and Branigan McDermott Knowlton
 
 
 [5]
 See infra note 7
 
 
 [6]
 In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981
 
 
 [7]
 The trial exhibits are not part of the record on appeal. Although the court has before it a complete copy of LCDR Morgan's investigative report, which presumably was included in the record on appeal as an exhibit to a memorandum filed in support of a motion, I can only assume, as the parties agree, that the portions of the report that the district court on July 10, 1984 ruled would be admissible at trial were actually admitted into evidence. I therefore assume that all 31 of the report's findings of fact were admitted into evidence, along with all of the report's opinions except paragraphs five, eight, and nine. (I also assume that the district court struck the opinion in paragraph six, which deals with the possibility that a "rollback" caused the accident, because that opinion can only be read along with paragraph five, which the district court explicitly held inadmissible during the July 10, 1984 pretrial conference.) Additionally, a colloquy between the trial judge and the parties' lawyers, outside the presence of the jury, indicates that the court also admitted into evidence the maintenance record of the plane that crashed; that record was attached to LCDR Morgan's report
 
 
 [8]
 Fed.R.Evid. 803(6) provides as follows:
 Rule 803. Hearsay Exceptions: Availability of Declarant Immaterial
 The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
 ....
 (6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.
 
 
 [9]
 Evaluative reports under Rule 803(8)(C) "are admissible only in civil cases and against the government in criminal cases in view of the almost certain collision with confrontation rights which would result from their use against the accused in a criminal case." Fed.R.Evid. 803 advisory committee's note
 
 
 [10]
 The Senate and House versions of Rule 803(8) differed slightly. The Senate version referred to another proposed rule, relating to the admissibility of certain criminal law enforcement records and reports. That reference was deleted by the Conference Committee, which adopted the House's version of the rule. See 4 J. Weinstein & M. Berger, Weinstein's Evidence 803-23 (1985); see also Baker v. Elcona Homes Corp., 588 F.2d 551, 557 n. 6 (6th Cir.1978), cert. denied, 441 U.S. 933, 99 S.Ct. 2054, 60 L.Ed.2d 661 (1979)
 
 
 [11]
 The House Committee Notes, the Senate Committee Notes, and the Conference Committee Notes do not discuss the significance of Rule 803(6)'s use of the terms "opinions" and "diagnoses" or how the scope of those terms differs from the scope of "factual findings," as used in Rule 803(8)(C)
 
 
 [12]
 Fed.R.Evid. 703 provides in full as follows:
 Rule 703. Bases of Opinion Testimony by Experts
 The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
 
 
 [13]
 Fed.R.Evid. 702 provides as follows:
 Rule 702. Testimony by Experts
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
 
 
 [14]
 Fed.R.Evid. 705 provides as follows:
 Rule 705. Disclosure of Facts or Data Underlying Expert Opinion
 The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.
 In Melville v. American Home Assurance Co., 584 F.2d 1306, 1316 (3d Cir.1978) (citation and footnote omitted), the Third Circuit noted the following:
 Before these objections [under Rules 702 and 705] may be recognized, however, the party challenging the validity of an official report admitted under 803(8)(C) must come forward with some evidence which would impugn its trustworthiness. To allow objections to be sustained under Rules 702 and 705 without a showing of untrustworthiness would have the practical effect of nullifying the exception to the hearsay rule provided by Rule 803(8)(C).
 
 
 [15]
 Fed.R.Evid. 401 provides as follows:
 Rule 401. Definition of "Relevant Evidence"
 "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
 Fed.R.Evid. 402 provides as follows:
 Rule 402--Relevant Evidence Generally Admissible; Irrelevant Evidence Inadmissible
 All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.
 
 
 [16]
 Fed.R.Evid. 403 provides as follows:
 Rule 403. Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.